James H. MORRISS, Appellant,

v.

UNITED STATES, Appellee.

Betsy COLE, Appellant,

v.

UNITED STATES, Appellee.

Nos. 84–1787, 84–1795.

District of Columbia Court of Appeals.

Argued Oct. 20, 1987.

Decided Feb. 22, 1989.

Jennifer P. Lyman, Public Defender Service, with whom James Klein and Reita Pendry, Public Defender Service, Washington, D.C., were on the brief, for appellant Morriss.

Lawrence M. Baskir, appointed by this court, for appellant Cole.

Ann K.H. Simon, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty.,

Chevy Chase, Md., at the time the brief was filed, Michael W. Farrell and Mary Ellen Abrecht, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before MACK, BELSON and STEADMAN, Associate Judges.

STEADMAN, Associate Judge:

This case, as presented by the government, involves a squalid murder for hire engineered by three older adults.[1] Testimony was introduced that appellant Cole, with the aid of one Maud Oates and appellant Morriss as intermediates, paid $2,500 for her husband to be killed by a trio of admitted drug addicts.[2] Cole's major arguments on appeal are addressed to the admission into evidence of Morriss' redacted confession and to purportedly tainted identifications. Morriss mainly challenges an instruction which permitted the jury to find him guilty of the husband's murder if it was the "natural and probable consequence" of criminal acts that he aided and abetted.

## I.

The government's case rested mainly on the testimony of four individuals solicited to commit the murder: Tyrone T. Williamson and Eugene C. Norman, who declined to do so, and Romes Austin and Edward M. Hawkins, who carried out the task.[3] In composite, their testimony set forth the following story. In early 1981, Morriss[4] approached four acquaintances of his, Williamson, Norman and two others, Alphonso J. LaBoard and Wayne Hubbard, on a District of Columbia street corner, and told them he knew a woman who was willing to pay to have something done to her husband. When the four men indicated their interest, Morriss took them to Oates' apartment, where they met with Oates and Cole. The discussion centered around doing something unspecified to Cole's husband.

After the meeting in the apartment, Cole accompanied LaBoard, Hubbard, Williamson, and Norman down to LaBoard's automobile. The five sat in the automobile, with LaBoard in the driver's seat, Cole in the front passenger seat and the remaining three in the back seat. In the discussion that ensued, Cole told the men that she wanted her husband killed. Cole told them that she was tired of having her husband beat her, and said something about insurance. When Cole refused to give the men any payment up front, they departed.

On Monday, March 9, 1981, two days before the killing of Cole's husband, Morriss made another attempt at finding some hit men to carry out Cole's wishes. This time he succeeded. Morriss approached Austin, Hawkins, and a third man, Sheppard, all of whom he knew from the neighborhood, and who frequented the same street corner as the first group. Morriss told them that he knew someone who wanted her husband killed. Sheppard stated a price of $2,500, and after making a phone call, Morriss took the three men to Oates' apartment. When they arrived, Oates was the only person in the apartment. Oates made a telephone call, and fifteen minutes later, Cole appeared at the back door. Though Oates did most of the talking during the discussion that followed, both

1. The record and briefs are not entirely consistent as to the parties' exact ages. It appears that Cole at the time of the murder and trial was in the 55–65 years old range, Oates in the 65–70 range and Morriss in the mid-60's range. Oates was definitely older than Cole. The spelling of Morriss' name follows that used in his brief.

2. Originally a co-defendant in this case, Oates passed away pending review of her conviction. Accordingly, we have previously granted the motion to dismiss her appeal and remanded her case with directions to dismiss her indictment by reason of her death. *Howell v. United States,* 455 A.2d 1371 (D.C.1983) (en banc).

3. Austin and Hawkins had previously entered into plea bargains with the government. A third participant, Ron–Dell Sheppard, was himself killed in a robbery shortly thereafter. All four men were regular drug users and had criminal records.

4. The government's theory was that Cole approached her friend Oates for assistance, who in turn contacted her friend Morriss (who did not know Cole). Cole's purpose in seeking the slaying was not entirely clear. Insurance proceeds, other financial considerations, and physical violence were mentioned in the course of the trial.

Oates and Cole said that Cole wanted to have her husband killed. The parties agreed that the murder would take place at around 4:30 a.m. on Wednesday, March 11, 1987, behind the Cole house as Cole's husband left for work. Cole said that she would be standing in the window watching the killing. Cole gave Sheppard a piece of paper with her address on it, and Oates agreed to pay the men at Oates' apartment on Wednesday, after the killing. Though Morriss apparently did not take part in these conversations, he was present in the room during the entire discussion. The four men then left. On the way back to their neighborhood, Morriss again re-assured the men that they would get their money.

As planned, at 4:15 on Wednesday morning Austin, Sheppard, and Hawkins met George Cole as he was leaving his house for work. Austin shot five bullets into Cole's head, back, chest, and abdomen. As the three men were making their escape, Austin looked up and saw the sillouette of a heavy-set woman in a second-story window of the Coles' house. Later that day, the killers called Oates to arrange the pay-off. That evening, they went to her apartment, where she handed them a bank envelope containing 20 one hundred dollar bills. Sheppard gave one of the bills back to Oates, as a tip. The men then left to purchase narcotics, divide the money, and travel to New York City, where they apparently spent most, if not all, of the remaining proceeds.

When they returned three days later, Sheppard telephoned Oates to arrange for payment of the final $500. Before going to Oates' apartment to collect the money, they encountered Morriss, who expressed his anger at not having been paid his promised cut of $300. After Oates paid the killers the final $500, Morriss was paid $200. He was upset that he did not get his full share.

Two to three weeks after the murder, Sheppard and Hawkins told Oates that Austin had been arrested. Concerned that they might be found out, Oates bought them one-way bus tickets to Detroit.

## II

Appellant Cole challenges the admission into evidence of a statement made by her nontestifying codefendant Morriss. The statement related Morriss' role in arranging the meeting between Cole, Oates and the three actual killers, corroborating the testimony of Austin and Hawkins. Morriss' statement was redacted so that all identifying references to Cole and Oates had been eliminated. In the redacted version, the references to Oates, Cole and Cole's husband had been replaced with, respectively, "person", "friend", and "guy". The goal of the redaction was to eliminate all references to Cole and Oates' relationship to the victim, their gender, Cole's national origin, and the location of Oates' home. (A copy of the statement, as redacted, is attached as an Appendix.)

In *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Supreme Court held that, despite limiting instructions, the admission of a nontestifying codefendant's confession which incriminated the defendant and referred to him by name violated that defendant's Sixth Amendment right to confront and cross-examine all witnesses testifying against him. However, in *Richardson v. Marsh*, 481 U.S. 200, 211, 107 S.Ct. 1702, 1709, 95 L.Ed.2d 176 (1987), the Court held that a defendant's right to confrontation was not violated by the admission of a nontestifying codefendant's confession (with a proper limiting instruction) where the confession had been redacted to eliminate all references to the defendant's very existence. The Supreme Court expressly left open the question of the admissibility of statements made by a nontestifying codefendant in which all references to the defendant are replaced with either a symbol or a gender neutral pronoun. *Id.* at 211 n. 5, 107 S.Ct. at 1709 n. 5.

This latter issue was recently addressed by a panel of this court in *Foster v. United States*, 548 A.2d 1370 (D.C.1988). In *Foster*, we held that "a properly and effectively redacted statement substituting neutral references for names (including nicknames and the like) and/or descriptions ... may

be admitted into evidence at a joint trial (when coupled with proper limiting instructions) unless a 'substantial risk' exists that the jury will consider that statement in deciding the guilt of the defendant." *Id.* at 1378. In determining whether such a risk exists, "the trial court must consider the degree of inference the jury must make to connect the defendant to the statement and the degree of risk that the jury will make the linkage despite a limiting instruction." *Id.* at 1379. The codefendant's statement must be viewed in the context of other evidence presented at trial to determine whether the redaction has been effective in avoiding linkage with the defendant. *Id.* at 1379. In *Foster* we also held that when it has been determined in a case that a codefendant's confession was improperly admitted in violation of the Confrontation Clause, the admission is then subject to harmless error analysis under *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *Foster, supra,* 548 A.2d at 1379.

■ Here, we cannot but find that there was a "substantial risk" that the jury would link Cole and Oates' names to the unnamed individuals referred to in Morriss' redacted statement. Morriss' redacted statement referred to a person who had a friend that wanted something done to a guy because that guy had been mistreating this friend. In light of the other evidence presented at trial, the jury would readily be able to infer that Morriss was referring to Cole (and her friend Oates) in his statement.

Under *Foster* we next apply the constitutional harmless error standard of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Four of the

government's important witnesses were admitted narcotics addicts with criminal records. Several were testifying under the arrangements with the government. Their testimony differed in some respects. Morriss, on the other hand, was an elderly person with no known criminal record whose testimony may have lent added credibility to that of the four impeached main witnesses. Cole and Oates presented a number of character and other witnesses and Oates took the stand herself to deny any involvement. In light of this record, we cannot conclude that if the jury, contrary to the trial court's instructions, used Morriss' statement in considering Cole's guilt, there is no "reasonable possibility that the evidence complained of might have contributed to the conviction." *Chapman, supra,* 386 U.S. at 23, 87 S.Ct. at 827 (quoting *Fahy v. Connecticut,* 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963)). Therefore, since we cannot find the error "harmless" under *Chapman,* we must hold that the admission of Morriss' redacted confession constituted reversible error.[5]

### III

Since the case must be retried, we deal also with Cole's additional contention that the trial court violated her due process rights in permitting in-court identifications by Norman after it had determined at a pretrial hearing that the photographic arrays from which his initial pretrial identifications were made were unduly suggestive.[6] The trial court properly proceeded to consider " 'whether under the "totality of the circumstances" the identification was reliable even though the confrontation procedure was suggestive.' " *United States*

---

5. In our analysis, we follow the majority holding in *Foster,* as we are bound to do. *M.A.P. v. Ryan,* 285 A.2d 310 (D.C.1971). However, in *Foster,* then Chief Judge Pryor wrote a concurring opinion advocating a two-step analysis under which a redacted statement is inadmissible only if the trial court determines first that the jury could link the defendant to the challenged statement without having to make a substantial inference, and second, that the statement constitutes a "vitally important part of the government's case" against the defendant. *Foster, supra,* 548 A.2d at 1382. Two members of the

present panel are persuaded by the general approach of Judge Pryor's opinion. If free to apply his test or a similar one, they would hold here that the redacted confession was properly admitted.

6. At trial, Cole was also identified by the two actual killers, Austin and Hawkins, although Hawkins' identification of Cole was weak. ("I am not sure if that is her.... Possibly.") This is not challenged on appeal.

*v. Walton,* 411 A.2d 333, 337 (D.C.1979) (quoting *Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972)). Given its greater opportunity to assess the demeanor, reliability and credibility of the witness, the trial court is accorded considerable deference in its finding of a substantial independent basis for an in-court identification. *Banton v. United States,* 411 A.2d 975, 979 (D.C.1980); *Walton, supra,* 411 A.2d at 339.

In the present case, Norman was examined extensively at the pretrial hearing on the basis for his ability to make reliable in-court identifications. Norman (who identified both Cole and Oates) testified to the meeting at Oates' apartment in early 1981 when he went there with LaBoard, Hubbard, Norman and Morriss. He had an unobstructed view of the two women's faces from a distance of seven to nine feet. They had his full attention. The room was lit by lamps and a light from the adjoining kitchen. After this meeting in the apartment, Norman spent an additional twenty-five to thirty minutes listening to Cole when they continued their meeting outside in the car. From his position in the rear seat behind the driver, Norman had an unobstructed view of Cole, who was seated in the front passenger seat. Norman was paying full attention to her because she was talking.

On the basis of such testimony (and that of LaBoard which is not the subject of any challenge on appeal since he did not testify at trial), the trial court concluded:

> [The] witnesses [had an] ample and adequate, independent source based upon those previous encounters and based upon which to make eyewitness identifications of both Ms. Byars [Oates] and Mrs. Cole.

Despite the length of time that elapsed between the meeting at the apartment and the identifications and certain alleged discrepancies and omissions in the identifications (the significance of which are questionable, and which in any event, the trial court was better able to evaluate), we cannot say that the trial court erred in finding

that the totality of the circumstances demonstrated the threshold of reliability required by due process for the admission of the in-court identifications. *Walton, supra,* 411 A.2d at 339; *Patterson v. United States,* 384 A.2d 663, 667 n. 6 (D.C.1978) ("When the due process concern is eliminated—*i.e.,* jeopardy to a fair trial because of a risk of misidentification—the issue again should become a matter for exploration at trial and argument to the jury.").

## IV

Morriss as part of his position at trial asserted that he had no knowledge that Cole wanted anything beyond (in the words of his statement to the police) "someone to rough this guy [her husband] up or something like that," and specifically that he knew nothing of the intent and plan to kill Cole's husband. On this possibility, at the government's request, the trial court gave the usual instruction on second-degree murder (of which Morriss was eventually convicted) and a special aider and abettor instruction that:

> As to second-degree murder while armed, there is no requirement that an aider or abettor have the identical intent of the principal at the time and place. He need not necessarily intend the particular crime be committed by the principal. He or she is liable for any criminal act which in the ordinary course of things was the natural and probable consequences of the crime that he or she advised, connived at or counseled or instigated, although such consequences may not have been intended by him or her.

### A.

Morriss argues that this instruction inadequately dealt with the *mens rea* required for the conviction of an aider and abettor of second degree murder. He asserts that aider and abettor liability can never rest on a lesser *mens rea* than that of the principal; that is, the aider and abettor must share or at least know of the principal's *mens rea.*[7]

7. Such an instruction was given with respect to      the first degree murder charge, which is not

■ This assertion, although not without force, runs counter to established precedent in this jurisdiction. In *Hackney v. United States*, 389 A.2d 1336, 1342 (D.C. 1978), *cert. denied*, 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 95 (1979), we expressly recognized that "[I]t is well settled that [the aider and abettor] need not necessarily have intended the particular crime committed by the principal; an accessory is liable for any criminal act which in the ordinary course of things was the natural and probable consequence of the crime that he advised or commanded, although such consequence may not have been intended by him." (quoting 22 C.J.S. *Criminal Law* § 92 at 164 (1961)). This principle is recognized as the generally prevalent standard. "The established rule, as it is usually stated by courts and commentators, is that accomplice liability extends to acts of the principal in the first degree that were a natural and probable consequence of the criminal scheme the accomplice encouraged or aided." 2 LaFave and Scott, *Substantive Criminal Law* § 6.8(b) 157 (1986). Thus, this doctrine was approved by us in application to a premeditated murder, felony murder, and first-degree burglary charge in *Williams v. United States*, 483 A.2d 292, 298–99 (D.C.1984), *cert. denied*, 474 U.S. 906, 106 S.Ct. 275, 88 L.Ed.2d 236 (1985).[8] Likewise, in *Johnson v. United States*, 386 A.2d 710 (D.C.1978), we upheld the conviction for assault with a dangerous weapon (automobile) of a defendant who initiated the original fistfight but was not directly involved in its evolution into another participant's running the complainant down with a car. We said "of course as an accessory Johnson was liable for any criminal act which was the natural and probable consequence of the initial encounter whether he did or did not intend the result accomplished." *Id.* at 713. *See also, Allen v. United States*, 383 A.2d 363, 367 (D.C. 1978) (aider and abetter of assault with intent to kill liable although no evidence that he had any such specific intent); *Collazo v. United States*, 90 U.S.App.D.C. 241, 196 F.2d 573 (1952). While Morriss attempts to distinguish these cases, we think they set forth a principle of law which we are bound to follow.[9]

**B.**

■ Morriss also argues that even if the instruction was correct in the abstract, on the facts of the instant case the killing as a matter of law[10] was not "a natural and probable consequence" of the acts intended to be aided and abetted by Morriss. He invokes the principle of tort law that the proximate cause requirement is not met if a "supervening" cause brings on the actual injury. Restatement (Second) of Torts §§ 440–442 (1965). Here, however, the chain of events initiated by Morriss in his recruitment of two groups of hardened money-seeking drug addicts to commit

challenged by the government. Morriss' argument is bottomed on the general proposition that accomplice liability cannot rest on objective considerations of probability but instead demands that the accomplice subjectively participate in the criminal act as something he wishes to bring about. *See United States v. Peoni*, 100 F.2d 401 (2d Cir.1938) (L. Hand, J.) approved in *Nye & Nissen v. United States*, 336 U.S. 613, 619, 69 S.Ct. 766, 770, 93 L.Ed. 919 (1949).

8. Williams was acquitted of premeditated murder and convicted on the other two counts. Morriss attempts to distinguish the Williams case as one involving felony murder, where any *mens rea* required for murder is irrelevant. But the felony murder liability reflected the doctrine's applicability to the burglary charge as well.

9. Morriss also asserts that at the minimum, the government must show that Morriss had a conscious, subjective awareness of the threat to human life as a natural and probable consequence of the acts he was putting in motion, and that objective probability was not enough. *See* note 7, *supra.* Our cases discussing the concept impose no such requirement, although in any event such awareness could be inferred and not proven by direct evidence. *Cf. United States v. Cox*, 166 U.S.App.D.C. 57, 59, 509 F.2d 390, 392 (1974). He also complains that the trial court erred in not providing further guidance on the issue of causation. But no such instruction was requested at trial and we see no plain error in its omission, if error at all. *Allen v. United States*, 495 A.2d 1145 (D.C.1985) (en banc).

10. The determination of natural and probable consequence is, as in tort law, "ordinarily a question for the jury." *See Wagshal v. District of Columbia*, 216 A.2d 172, 175 (D.C.1966).

"roughing up or something like that" led in a steady progression to the husband's ensuing death. We perceive no evidence of such a marked shift of events or other facts as to compel a finding of intervening cause. *See id.* at §§ 442–43; PROSSER & KEATON ON TORTS § 41 (5th ed. 1984). *Cf. McKinnon v. United States,* 550 A.2d 915 (D.C.1988) (fatal hepatitis infection from treatment of otherwise nonfatal wound not "intervening cause" in first-degree murder); RESTATEMENT (SECOND) OF TORTS § 448 (1965) (an intentional tort or crime is an intervening event "unless the actor at the time … realized or should have realized … that such a situation [*i.e.,* the opportunity to commit a crime] might be created, and that a third person might avail himself of the opportunity to commit such a tort or crime"). [11]

### C.

■ The question remains, however, whether Morriss' conviction can stand in light of our reversal for trial error of the conviction of Cole.[12] Even the acquittal of a principal does not preclude conviction of an aider and abettor, *Standefer v. United States,* 447 U.S. 10, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980). However, it is necessary that the government show that "the act constituting the offense was in fact committed by someone." *Gray v. United States,* 104 U.S.App.D.C. 153, 154, 260 F.2d 483, 484 (1958). "One cannot aid and abet in the commission of a crime unless there is another who has committed the offense."

*Jackson v. United States,* 395 A.2d 99, 103 n. 6 (D.C.1978) and cases cited.

■ The difficulty presented here is that, as discussed above, Morriss's liability for second degree murder of the husband depends upon the murder's linkage with his proven actions, so that the murder may be found a "natural and probable consequence" thereof. To achieve this result, it will not suffice that the murder be committed by "someone." The government's whole theory of Morriss' consequential liability depends upon his solicitation of the killers at the behest of Oates and Cole, and the latters' participation in arranging for the slaying. We do not think, therefore, that under the case as presented by the government, Morriss' conviction can fairly stand in the wake of trial error in the convictions by the same jury of the primary participants, Oates and Cole.[13] Accordingly, finding it "just in the circumstances," D.C.Code § 17–306 (1981), we reverse and remand for a new trial in Morriss's case as well.

REVERSED AND REMANDED.

### APPENDIX

Q. Are you giving this statement freely and without any promises?

A. Yeah there wasn't no pressure.

Q. How far did you go in school?

A. Tenth grade.

Q. Do you want something to drink?

A. No.

---

**11.** Morriss makes a generalized argument to us that all documents and testimony of various financial matters relating to Cole (mostly bearing on a possible motive for the killing) which took place preceding and following the period of the conspiracy are inadmissible under the coconspirator exception to the hearsay rule. The government does not contest the contention that to the extent that such evidence was admissible solely under the coconspirator exception to the hearsay rule, *see Chavarria v. United States,* 505 A.2d 59 (D.C.1986), statements prior to the commencement of the conspiracy in early 1981 must be excluded. *See, e.g., United States v. Tombrello,* 666 F.2d 485 (11th Cir.), *cert. denied,* 456 U.S. 994, 102 S.Ct. 2279, 73 L.Ed.2d 1291 (1982). However, this limitation does not apply to matters that are not hearsay or to hearsay items admissible under another hearsay exception. Since the nature of the evidence on retrial, the ground proposed for its admission, and the objections thereto cannot be squarely determined, we do not think we can usefully deal further with this issue on the present appeal.

**12.** With respect to the conviction of Oates, *see* note 2 *supra.*

**13.** We are not unmindful of the fact that in Morriss' case, his statement to the police provided an additional strand of evidence which should not be used against Oates and Cole. This may have been relevant in the event of separate trials or even in a joint trial where a jury convicted Morriss while acquitting Cole and Oates, but in the instant appeal before us, we cannot tell how the jury interrelated factors in determining the guilt of each of the three defendants.

Q. Tell me to the best of your knowledge what you know about the death of George Cole.

A. I got a call from a person who talked about a friend. This guy was mistreating the friend bad. The friend wanted someone to rough this guy up or something like that. I told the person who called me I didn't know any one right then. I went out and told some guys on the corner. A couple days later I got a contacted [sic] and I called the person who had called me, and let them talk on the phone. I then took them down to the house of the person who called me. We got to the house, and they talked—the person's friend and the three dudes talked. I don't know if the person who called me was in on the conversation, but I wasn't. I don't know what they talked about. After they stopped talking we all, the three dudes and me went back up town. A week or so later Eddie came by my house and gave me two hundred dollars and said, "This is for your time calling me, the contact".

Q. Were you present any other time, other than what you described, at the house of the person who called you with any of the three dudes you took there to meet the second person?

A. No.

Q. What was the second person's name?

A. I don't know. No idea.

Q. Would you like to go to the bathroom?

A. Not right now—I'll tell ya.

Q. Who were the men you took to the house of the person who called you to meet the second person?

A. Ronnie, Eddie, a third man I don't know they was with him.

Q. Did they ever mention to you what they were going to do to the guy?

A. They didn't tell me they talked it over.

Q. The second person really was talking to one of the dudes—he was doing the talking?

A. I think Ronnie.

Q. Did Ronnie tell you what they did to the guy when he paid you the $200.00.

A. No.

Q. When did you hear about the murder?

A. About seven days later, the person who had called me never told me they killed him.

Q. Is there anything you wish to add to this statement?

A. No I tell you everything I knows about it. There ain't too much to tell. I wasn't involved in no murder. All I did was make the contact with the dudes, and the second person at the house of the person who had called me.