**UNITED STATES of America,
Appellant,**

v.

**Rayful EDMOND, III, Appellee.**

**No. 90–3161.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 9, 1990.

Decided Jan. 22, 1991.

Rehearing and Rehearing En Banc
Denied March 28, 1991.

---

262

John R. Fisher, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John P. Dominguez and Elisabeth A. Bresee, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellant.

Plato Cacheris (appointed by the court), with whom Philip T. Inglima, Washington, D.C., was on the brief, for appellee.

Before SILBERMAN, HENDERSON, and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

Dissenting Opinion filed by Circuit Judge SILBERMAN.

RANDOLPH, Circuit Judge:

This appeal raises two issues. The first is whether District of Columbia law permits Rayful Edmond, III to be prosecuted for aiding and abetting a first-degree murder after the gunman has been acquitted of that offense. The second question arises because Edmond successfully moved to sever counts in a multi-count indictment, forcing the government to try him twice, first for conspiracy and second for a murder allegedly committed in furtherance of the conspiracy. The question is whether the Double Jeopardy Clause of the Fifth Amendment bars the government, in the second trial, from proceeding on the basis that Edmond's participation in the conspiracy rendered him guilty of the murder.

## I

On June 20, 1989, Rayful Edmond, III, Columbus Daniels and twenty-seven others were named as defendants in a forty-three count, superseding indictment. The indictment charged the defendants with participating in a conspiracy to violate federal narcotics laws and with committing various drug-related offenses. Count 21, which is at the center of this appeal, charged Edmond and Daniels with first-degree murder while armed:

RAYFUL EDMOND III, and COLUMBUS DANIELS, also known as "Little Nut," within the District of Columbia, while armed with a pistol, purposely and deliberately with premeditated malice, killed Brandon Terrell, by shooting him with a pistol on or about June 23, 1988, thereby causing injuries from which Brandon Terrell died on or about June 23, 1988.

(In violation of Title 22, D.C. Code, Sections 2401, 3202 and 105).

The government had two theories for proving Edmond's guilt of Count 21. The first was aiding and abetting. The second was that Edmond created and controlled a large conspiracy to distribute cocaine and that Brandon Terrell was murdered in furtherance of that unlawful agreement. Whether Edmond was on notice of this second theory is in dispute. In this appeal, the government informs us that it expected to show that Edmond supplied drugs to Terrell, that Terrell refused to pay for the drugs, and that Terrell wanted to compete with Edmond by establishing his own drug distribution network. On the evening of Terrell's death, the following events allegedly transpired. Terrell insulted Edmond and argued with him when they met at a Washington, D.C., nightclub. Before leaving the nightclub, Edmond told Columbus Daniels, one of his lieutenants, to go outside, retrieve a gun, and wait for an instruction to shoot Terrell. Later, outside the club, Edmond and Terrell argued again. Edmond withdrew and, upon his signal, Daniels shot and killed Terrell.

On the motions of Edmond and other defendants, the district court severed Count 21 and other counts charging firearms offenses and crimes of violence. The court also severed the defendants. Two trials of different defendants proceeded on the conspiracy counts and other drug-related counts. On December 6, 1989, the jury found Edmond guilty of participating in a conspiracy to violate federal narcotics laws, conducting a continuing criminal enterprise, unlawfully employing persons under the age of eighteen, travelling interstate in aid of racketeering, and unlawfully using a communications facility. In a separate trial, the jury convicted Daniels of conspiracy.

Edmond, Daniels and two additional defendants (James Antonio Jones and Jerry Millington) still faced trial on the severed counts. In proceedings unnecessary to recount in detail (*see* 738 F.Supp. 572 (D.D.C. 1990)), the district court dismissed the one remaining federal charge (carrying a firearm in connection with a drug trafficking offense, 18 U.S.C. § 924(c)). This left only counts charging violations of District of Columbia law, including Count 21. The district court initially had pendent jurisdiction over these local offenses as a result of their joinder with the federal charges in the indictment (*see United States v. Koritko*, 870 F.2d 738, 739 (D.C.Cir.1989)). Although no federal charges remained to be tried, the court exercised its discretionary authority to retain jurisdiction over the local offenses and scheduled the trial of these defendants for July 12, 1990. 738 F.Supp. at 579.

Before that date, the government dismissed without prejudice the charges against Jones and Millington. On Edmond's motion, the court ordered that he and Daniels be tried separately. Daniels was tried first on Count 21. On June 21, 1990, the jury returned a special verdict, finding Daniels not guilty of first-degree murder while armed but guilty of the lesser included offense of second-degree murder while armed.

This caused Edmond to move for a reduction of the murder charge against him to second-degree murder while armed, to the extent his responsibility rested on aiding and abetting Daniels. The court granted

Edmond's motion and, in another ruling, held that the Double Jeopardy Clause barred the government from proving Edmond's guilt by showing that Daniels murdered Terrell in furtherance of a conspiracy of which Edmond was a member. The government brought this appeal instead of prosecuting Edmond in compliance with these rulings.

## II

■ The district court reduced the charge against Edmond to second-degree murder on the ground that District of Columbia law does not permit an aider and abettor to "be tried for an offense greater than that committed by the principal." Memorandum opinion at 4 (July 11, 1990). Daniels' acquittal of first-degree murder therefore relieved Edmond of liability for that offense.

■ Whether the district court ruled correctly turns on the meaning of D.C.Code § 22–105:

In prosecutions for any criminal offense all persons advising, inciting, or conniving at the offense, or aiding or abetting the principal offender, shall be charged as principals and not as accessories, the intent of this section being that as to all accessories before the fact the law heretofore applicable in cases of misdemeanors only shall apply to all crimes, whatever the punishment may be.

D.C.Code § 22–105 is an Act of Congress applicable exclusively to the District of Columbia. We do not treat such local statutes as if they were part of the United States Code. Our policy has been to defer to the District of Columbia Court of Appeals on questions of statutory interpretation. D.C.Code § 11–102; *Hall v. C & P Tel. Co.*, 793 F.2d 1354, 1358 & n. 9 (D.C. Cir.1986), *reh'g denied*, 809 F.2d 924 (D.C. Cir.1987). The Supreme Court does the same, treating interpretations by the District of Columbia Court of Appeals as if they were rendered by the highest court of a State on questions of state law, with the exception that the Court will interpose its own judgment when it detects an egregious error. *Pernell v. Southall Realty*, 416 U.S. 363, 368–69, 94 S.Ct. 1723, 1726, 40 L.Ed.2d 198 (1974); *Whalen v. United States*, 445 U.S. 684, 687–89, 100 S.Ct. 1432, 1435–36, 63 L.Ed.2d 715 (1980).

The District of Columbia Court of Appeals has determined that D.C.Code § 22–105 "does not differ substantially from its federal counterpart." *Hackney v. United States*, 389 A.2d 1336, 1342 (D.C. 1978), *cert. denied*, 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 95 (1979). For that reason, if the court of appeals were faced with the issue presented here it would doubtless consult *Standefer v. United States*, 447 U.S. 10, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980), and its interpretation of 18 U.S.C. § 2(a), which renders anyone who aids or abets the commission of a federal offense "punishable as a principal." The district court thought, however, that *Standefer* would exert little influence on the court of appeals. We disagree. The similarity between the federal and local statutes and their common origin, which *Standefer* describes, entitles the Supreme Court's decision to far more weight than the district court was willing to give it.

*Standefer* held that a defendant accused of aiding and abetting the commission of a federal offense may be convicted despite the principal's acquittal of that offense. Early common law applied this rule to aiders and abettors of misdemeanors. A more complicated rule governed aiders and abettors of felonies. Principals in the second degree—that is, accessories who were actually or constructively present at the scene of the felony offense—were treated in the same manner as abettors of misdemeanors. 447 U.S. at 16, 100 S.Ct. at 2004. Other accessories in felony cases, however, were treated differently. Their liability was considered derivative and their fate depended on the fate of the principals, who were required to be tried first. If the actual perpetrators were never tried, or were acquitted, or were pardoned after conviction, these accessories could not be held criminally liable for the offense. *Id.* Early in this century, as part of a general reform movement, Congress adopted the common law misdemeanor rule for all federal of-

fenses. 447 U.S. at 18–19, 100 S.Ct. at 2005. The Supreme Court found that the predecessor of 18 U.S.C. § 2(a) had abolished the common law's misdemeanor-felony distinction by directing that whoever aided or abetted the commission of an offense "is a principal." 447 U.S. at 18, 100 S.Ct. at 2005. Under federal law, acquittal of the direct perpetrator thus became irrelevant in the accessory's prosecution.

Of particular importance to this case, the Court in *Standefer* supported its interpretation of the federal aiding and abetting statute by relying on D.C.Code § 22–105, which Congress passed in 1901. 447 U.S. at 18 & n. 10, 100 S.Ct. at 2005 & n. 10. The federal and District of Columbia statutes, although enacted several years apart, were "part and parcel of [the] same reform movement," and both provisions contained language "unmistakably demonstrat[ing]" that accessories were to be treated as principals. 447 U.S. at 18, 100 S.Ct. at 2005.

D.C.Code § 22–105, if anything, was even clearer than the federal statute. It contained an explanatory clause stating: "the intent of this section being that as to all accessories before the fact the law heretofore applicable in cases of misdemeanors only shall apply to all crimes, whatever the punishment may be." In light of the history recounted in *Standefer*, the import of this clause is as certain as can be. The "law heretofore applicable in cases of misdemeanors" was that "all participants were deemed principals" and that "a prior acquittal of the actual perpetrator did not prevent the subsequent conviction of a person who rendered assistance." 447 U.S. at 16, 100 S.Ct. at 2004.

Only a short time ago, we held that an aiding-and-abetting conviction pursuant to § 22–105 "may stand even where the principal is acquitted in a separate trial." *United States v. Richardson*, 817 F.2d 886, 888 (D.C.Cir.1987). The proposition was so certain that we summarily rejected an argument against it, citing *Standefer* and *Murchison v. United States*, 486 A.2d 77, 81 (D.C.1984), which affirmed the conviction of an aider and abettor despite the principal's mistrial. 817 F.2d at 888.

We would be inclined to dispatch Edmond's argument in the same manner but for the intervening decision in *Morriss v. United States*, 554 A.2d 784 (D.C.1989), and the significance the district court attributed to it. Morriss was tried for aiding and abetting the murder-for-hire of co-defendant Cole's husband. His role in the murder consisted in procuring the three gunmen Cole hired. In a joint trial, Morriss and Cole were convicted of second-degree murder. The court of appeals reversed Cole's conviction on the ground that a pretrial statement by Morriss, who did not testify, should not have been admitted against her (*see Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)). 554 A.2d at 787.

Morriss' appeal presented a separate question. Morriss had defended on the basis that he thought Cole only wanted her husband beaten and that he, Morriss, did not know of her intention to have him murdered. Over Morriss' objection, the trial court instructed the jury that an aider and abettor need not intend the particular crime committed by the principal so long as the crime was the natural and probable consequence of his actions. The court of appeals sustained the instruction, rejecting Morriss' argument that an aider and abettor must share, or at least know of, the *mens rea* of the principal. 554 A.2d at 788–89. Nevertheless, the court reversed Morriss' conviction and remanded so that he could be retried with Cole.

The reasoning behind this disposition seems to us rather obscure. Citing *Standefer*, the court of appeals stated that "[e]ven the acquittal of a principal does not preclude conviction of an aider and abettor," although the government must show that someone actually committed "the act constituting the offense." 554 A.2d at 790. But the court's reversal of Cole's conviction presented what it described as a "difficulty" with respect to Morriss' conviction. *Id.* The "difficulty" appears to have been evidentiary in nature. After reciting that the "government's whole theory of Morriss' consequential liability depends upon his solicitation of the killers at [Cole's] be-

hest" and her "participation in arranging for the slaying," the court concluded that Morriss' conviction could not "fairly stand in the wake of trial error in the conviction[ ] by the same jury of the primary participant[ ], . . . Cole." *Id.* At this point the court dropped a footnote acknowledging that Morriss' pretrial statement "provided an additional strand of evidence" against him but not Cole and stating that "[t]his" may have been relevant in separate trials "or even in a joint trial where a jury convicted Morriss while acquitting Cole" (554 A.2d at 790 n. 13). The footnote concluded, however, that the court could not "tell how the jury interrelated factors in determining the guilt of" Cole and Morriss. *Id.* Morriss' pretrial statement recounted his connection with Cole and his understanding that Cole only wanted someone to "rough up" her husband. 554 A.2d at 791. Perhaps the court thought the jury might somehow have misused Morriss' statement in finding *him* guilty. For example, suppose the jury first erroneously found Cole guilty in light of Morriss' pretrial statement and, using that improper finding, decided that Morriss was also guilty because Cole's actions were the "natural and probable consequence" of Morriss' assistance. The jury could have done this only by violating the instructions, but the court of appeals thought that such a violation might have occurred. 554 A.2d at 787. If this was the court's thinking in *Morriss,* it explains why—as the footnote strongly suggests—the court would have sustained Morriss' conviction if he had been tried separately or if, in a joint trial, Cole had been acquitted.

At all events, we are confident that the court of appeals did not intend its decision in *Morriss* to represent an interpretation of § 22–105 in conflict with the Supreme Court's reading of that District of Columbia provision in *Standefer.* The court of appeals did not even mention § 22–105, let alone analyze its language and the extensive history behind Congress' choice of words. Courts do not generally construe statutes without at least mentioning them and we will not impute such an odd method of decisionmaking to the court of appeals.

Furthermore, the court of appeals cited *Standefer* and accurately paraphrased the Supreme Court's holding. This signified the court's approval, or at least acceptance, of the Supreme Court's decision that even the acquittal of the principal does not bar a separate prosecution of an alleged aider and abettor.

*Morriss* therefore does not represent some new, authoritative interpretation of § 22–105 by the District of Columbia Court of Appeals. Edmond's contrary argument rests on a perceived inconsistency between the court's judgment reversing Morriss' conviction and the rule of law recognized in *Standefer* and in the *Morriss* opinion. But if we accepted Edmond's reasoning, which we do not, the most we could say is that *Morriss* misapplied the settled law of aiding and abetting, not that it formulated an entirely new construction of § 22–105 totally at odds with its plain language, the manifest intention of Congress, the extensive history of this and other congressional legislation examined in *Standefer,* and a line of cases construing § 22–105 going back as far as 1907.

■ The district court's basic mistake was in thinking that, in view of the Daniels verdict, Edmond was being prosecuted for aiding and abetting a first-degree murder that never happened. That view is contrary to District of Columbia law. Whether there has been a first-degree murder remains to be determined—by the jury at Edmond's trial, where the government must prove this offense. *See Allen v. United States,* 383 A.2d 363, 367 (D.C. 1978). This is the point of *Jefferson v. United States,* 558 A.2d 298 (D.C.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 748, 107 L.Ed.2d 765 (1990), which the district court cited. *Jefferson* held that one "cannot be convicted of carrying a pistol without a license on an aiding and abetting theory where there is no proof that the person in actual possession of the pistol did not have a license to carry it." 558 A.2d at 303. *Jefferson* simply recognizes that in the abettor's trial, the government must prove the criminal act the defendant is accused of abetting.

■ The special verdict in Daniels' case is an entirely separate matter. The jury there decided only Daniels' culpability. Its verdict said nothing about Edmond or his alleged role in bringing about Terrell's death. Under § 22–105, Edmond must stand trial as a principal, which means that whether he is guilty and, if so, the degree of his offense, will depend entirely on what the government proves at his trial. That much has been settled in the District of Columbia since 1907. The first reported case under § 22–105 recognized that one who commands a crime to be done is guilty of the crime even if the actual perpetrator is guiltless and held that "[o]ur Code obliterates the former distinction between principals and accessories before the fact," *Maxey v. United States*, 30 App.D.C. 63, 76 (1907). As to Edmond's prosecution, Daniels' acquittal of first-degree murder is therefore "irrelevant." *Standefer*, 447 U.S. at 20, 100 S.Ct. at 2006.

The decision in *Morriss* is fully consistent with that result. Whatever else *Morriss* may signify, the court of appeals there firmly rejected the notion that an aider and abettor must share the *mens rea* of the principal. 554 A.2d at 789. In so ruling, the court of appeals relied on its decision in *Hackney v. United States*, which held that "it is the abettor's state of mind rather than the state of mind of the perpetrator which determines the abettor's guilt or innocence." 389 A.2d at 1341, quoting PERKINS, CRIMINAL LAW 662 (2d ed. 1969). *See also Allen v. United States*, 383 A.2d at 367–68; *Shanahan v. United States*, 354 A.2d 524, 528 (D.C.1976).

Our brother Silberman, in dissent, nevertheless thinks the District of Columbia Court of Appeals has doubts about "the fairness of convicting an aider and abettor *if* the principal were not convicted (or were convicted of a lesser charge)." But even if "fairness," rather than § 22–105, controlled, we fail to see how prosecuting Edmond for the greater offense while Daniels stands convicted only of the lesser could give rise to that concern. Indeed, if *Morriss* stood for what our dissenting colleague supposes, the decision would constitute a major convulsion, a flat contradiction of the law of accessorial liability applied for at least three centuries. Even at early common law, Edmond's prosecution for first-degree murder would have been proper. On the government's theory, common law would consider Edmond a principal in the second degree, an accessory "at the fact," and "a principal in the second degree may be convicted of a higher degree of guilt than the principal in the first degree. The former may be convicted of first degree murder, for example, although the latter has been convicted of second degree murder." Perkins, *Parties to Crime*, 89 U.PA.L.REV. 581, 608–09 (1941). There is nothing unfair about this. First-degree murder requires premeditation, as when a killing is planned and calculated; second-degree murder does not involve planning, although the homicide is committed intentionally and with malice aforethought. *Harris v. United States*, 375 A.2d 505, 507–08 (D.C.1977); *Austin v. United States*, 382 F.2d 129, 137 (D.C.Cir.1967). In a joint trial, if a jury thought an aider and abettor carefully conceived a murder but enlisted an executioner only at the last possible moment, it could consistently convict the abettor of first-degree murder while finding the actual perpetrator guilty only of the lesser offense. There is no reason why separate juries in separate trials of the principal and the aider and abettor would be acting inconsistently or unfairly if they did the same. The degree of murder in each case depends on the *mens rea* of the defendant who is on trial. This is hardly a new insight. In 1724, William Hawkins explained that "if there were Malice in the Abettor, and none in the Person who struck the Party, it will be Murder as to the Abettor, and Manslaughter only as to the other." W. HAWKINS, A TREATISE ON THE PLEAS OF THE CROWN, BOOK II, at 312 (1724), *reprinted in* AMERICAN LAW: THE FORMATIVE YEARS (M. Horwitz & S. Katz eds. 1972). *See also* Perkins, *supra*, 89 U.PA.L.REV. at 609 & n. 239, citing I Hale P.C. *438, for the same point.

One of the basic duties of an appellate court is to signify when it is departing from precedent and to provide a legal

analysis explaining why it is changing course. The District of Columbia Court of Appeals knows this as well as we do. *Morriss* can carry the meaning our dissenting colleague ascribes to it only if the court of appeals breached that basic duty. In order to agree with our brother Silberman, we would have to conclude that the court of appeals, without saying so, disagreed with *Hackney v. United States*, 389 A.2d at 1342, which recognizes—as does *Standefer*—that there is *no* substantial difference between the federal statute on aiding and abetting and D.C.Code § 22–105. We would have to view *Morriss* as Janus-faced, as a decision expressly relying on *Standefer* for the principle that acquittal of the actual perpetrator does not bar prosecution of the abettor, while silently rejecting that principle on the basis of some unexpressed concerns about fairness. We would also have to believe that the court of appeals, without any discussion, tossed aside its many other decisions that under § 22–105, aiding and abetting is not a derivative offense and that the acquittal or even the "entry of a 'no finding' as to the principal" does not bar conviction of the aider and abettor. *Strickland v. United States*, 332 A.2d 746, 749 (D.C.1975), citing with approval *Gray v. United States*, 260 F.2d 483, 484 (D.C.Cir.1958); and *United States v. McCall*, 460 F.2d 952, 955 n. 13 (D.C.Cir. 1972).

That we find nothing in *Morriss* to warrant such extraordinary treatment does not, as the dissent infers, reflect any lack of deference. The disagreement between us and our colleague is not about whether deference is due. It is about whether we should read into an opinion concerns never mentioned, intentions never revealed and interpretations of a statute never cited. Out of respect for the court of appeals, this we refuse to do.

We are also urged to defer to the district court's interpretation of District of Columbia law to an even greater extent than would be compelled by the force of the court's reasoning. *See Russell v. Salve Regina College*, 890 F.2d 484 (1st Cir.1989), *cert. granted*, — U.S. —, 110 S.Ct. 3269, 111 L.Ed.2d 780 (1990). But whatever deference we gave, we would still be constrained to set aside the court's judgment. Our firm conclusion is that the court erred in determining that D.C.Code § 22–105 forbids prosecution of an aider and abettor for an offense after the principal has been found not guilty of the same offense.

## III

The remaining issue requires an understanding of *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), which establishes two propositions important to our decision. The first is that "commission of [a] substantive offense and a conspiracy to commit it are separate and distinct offenses," so that "the plea of double jeopardy is no defense to a conviction for both offenses." 328 U.S. at 643, 66 S.Ct. at 1182. The second is that the criminal act of one conspirator in furtherance of the conspiracy is "attributable to the other[ ] [conspirators] for the purpose of holding them responsible for the substantive offense." *Id.* at 647, 66 S.Ct. at 1184. This second aspect of *Pinkerton*, commonly known as the *Pinkerton* theory of liability or the *Pinkerton* doctrine, would permit the government to make its case against Edmond by proving that Daniels murdered Terrell in furtherance of a conspiracy of which Edmond was a member. The government planned to proceed on this basis in addition to establishing Edmond's guilt as an aider and abettor.

The district court barred use of a *Pinkerton* theory at Edmond's murder trial because the government would reprove the drug conspiracy, which would become a lesser included offense of the murder charge. In light of *Grady v. Corbin*, — U.S. —, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), and *United States v. Rosenberg*, 888 F.2d 1406 (D.C.Cir.1989), the district court concluded that this would deprive Edmond of his right under the Double Jeopardy Clause not to be twice put in jeopardy of the narcotics conspiracy charge. The correctness of that ruling is the only question raised with respect to the *Pinkerton* theory.

■ The government does not dispute that if Edmond had been tried and convicted of the conspiracy and then indicted for the murder, *Grady* and *Rosenberg* would stand in the way of the government's proving the conspiracy to establish Edmond's liability for the murder. But the Double Jeopardy Clause does not apply, the government contends, because the separate trials are simply the consequence of Edmond's severance motion. The district court rejected this argument. Edmond had not knowingly waived his double jeopardy right, the court ruled, because the indictment failed to inform him of the government's *Pinkerton* theory.

At the time Edmond filed his motion for a separate trial on the murder charge, he had no double jeopardy claim to assert or to waive. He was then set to be tried for conspiracy and murder in one proceeding. *Pinkerton* and other Supreme Court decisions confirm that nothing in the Double Jeopardy Clause prohibits the government from prosecuting a defendant for multiple offenses, including lesser included offenses, in one trial. *Ohio v. Johnson,* 467 U.S. 493, 500, 104 S.Ct. 2536, 2541, 81 L.Ed.2d 425 (1984); *Jeffers v. United States,* 432 U.S. 137, 152, 97 S.Ct. 2207, 2217, 53 L.Ed.2d 168 (1977); *Brown v. Ohio,* 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977).

■ The district court thought that Edmond was entitled to be informed of the government's *Pinkerton* theory before he moved to sever the murder charge. Why the district court also thought the information had to be contained on the face of the indictment is not apparent. Indictments do not recite the government's theory of proof, which is what the *Pinkerton* theory is. Despite the all too common use of "speaking" indictments, the function of a federal indictment is to state concisely the essential facts constituting the offense, not how the government plans to go about proving them. Fed.R.Crim.P. 7(c)(1). The indictment here did just that and we therefore reject any suggestion it should have done more.

At all events, the indictment's listing of Terrell's murder as an overt act in the drug conspiracy was enough to alert the defense to the prospect of a *Pinkerton* theory. If the defense had any lingering doubts, these ended when the government responded to the severance motions of Edmond's co-defendants, which Edmond had joined. In each opposition, the government stated that all defendants were, under *Pinkerton,* legally responsible for the murder of Terrell "since they are co-conspirators with the persons who actually did the shootings." The portent of this did not elude Edmond's counsel. In a hearing on August 3, 1989, when Edmond's counsel argued in favor of severing the murder count, he expressed his understanding of the government's position that "the shootings and killings were committed in furtherance of a conspiracy." Transcript of Aug. 3, 1989, at 12. The court granted Edmond's severance motion the day after the hearing, on August 4, 1989.

■ The record therefore shows that Edmond had notice of the government's *Pinkerton* theory before the court granted the severance motion and set the murder count down for a separate trial. Under the district court's waiver analysis, Edmond therefore knowingly relinquished his double jeopardy claim by successfully seeking separate trials. We are reluctant, however, to rest our decision on waiver. The Double Jeopardy Clause imposes no duty on the government to inform defendants of the consequences of their winning severance motions. The Supreme Court, in two closely-analogous double jeopardy cases, neither employed a waiver analysis nor mentioned the term. Under these decisions, a defendant who has caused the government to proceed against him in successive trials on separate counts in a multi-count indictment has no double jeopardy right to waive.

*Ohio v. Johnson,* 467 U.S. at 501, 104 S.Ct. at 2541, rejected the idea that a defendant's pleading guilty to a lesser included offense in a multi-count indictment raised a double jeopardy bar to prosecution on the greater offense. It follows from *Johnson*

that if Edmond had entered a guilty plea to the drug conspiracy count, rather than moving to sever it, the government would still be entitled to prove the conspiracy to establish his guilt on the remaining murder charge. *Id.* This case, of course, is different because Edmond's conspiracy conviction resulted from a verdict, not a guilty plea. But we do not believe the Supreme Court meant the Double Jeopardy Clause to turn on that distinction. The Court expressed its ruling without distinguishing between initial convictions after guilty pleas or after trials: "a determination of guilt and punishment on one count of a multicount indictment [does not raise] a double jeopardy bar to continued prosecution on any remaining counts that are greater or lesser included offenses of the charge just concluded." *Id.*

Although the Court in *Johnson* did refer to the absence of a trial on the lesser included offense to which the defendant pleaded guilty, the Court did so to illustrate the lack of "governmental overreaching that double jeopardy is supposed to prevent." 467 U.S. at 502, 104 S.Ct. at 2542. The absence of prosecutorial abuse is just as apparent here. Nothing constrained Edmond to move for a severance of counts except the hope of gaining some tactical advantage. When his motion succeeded, it was not the government who, in the language of the Double Jeopardy Clause, caused Edmond "to be twice put in jeopardy." Edmond did this to himself.

*Jeffers v. United States* is similar. There the defendant successfully opposed the government's motion for a consolidated trial on two indictments charging related offenses. The Court rejected the defendant's claim that the Double Jeopardy Clause barred his trial on the second indictment after he had been convicted on the first. Justice Blackmun's plurality opinion spoke directly to the situation in this case: "although a defendant is normally entitled to have charges on a greater and lesser offense resolved in one proceeding, there is no violation of the Double Jeopardy Clause when he elects to have the two offenses tried separately and persuades the trial court to honor his election." 432 U.S. at

152, 97 S.Ct. at 2217. That statement, which is fully consistent with the Court's later decision in *Johnson*, would doom Edmond's double jeopardy claim.

Edmond stresses a footnote in the *Jeffers* plurality opinion, which said that the "considerations relating to the second trial obviously would be much different if any action by the Government contributed to the separate prosecutions on the lesser and greater charges." 432 U.S. at 152 n. 20, 97 S.Ct. at 2217 n. 20. He argues that the government contributed to his separate trials because, if its *Pinkerton* theory had appeared on the face of the indictment, he might not have moved to sever. The obvious answer is that Edmond, not the government, caused the separate trials. Furthermore, we have already ruled that an indictment does not have to contain the government's theory of proof and that, in any event, Edmond had notice of how the government planned to proceed on the murder count.

In his final claim, Edmond returns to *Johnson* and seizes on the Court's statement that the Double Jeopardy Clause serves to prevent prosecutorial overreaching. 467 U.S. at 502, 104 S.Ct. at 2542. The "overreaching" here is supposedly of two sorts: requiring Edmond to stand trial for murder when he has already been tried and convicted for other offenses; and trying him for murder when he is already serving three life sentences with no possibility of parole. There is nothing to either claim. Edmond is facing another trial because he allegedly murdered Brandon Terrell. When the government refuses to disregard the killing of a human being and insists on trying a defendant charged with violating society's most important rule, it is not overreaching. Edmond's punishment for his other crimes may already have reached the maximum. But the responsibility for Brandon Terrell's death has yet to be fully determined. That is the proper function of a criminal trial.

One matter remains to be considered. On July 9, 1990, the district court ruled that the government could not introduce evidence of the drug conspiracy because,

under Rule 403, Fed.R.Evid., its prejudicial effect would outweigh its probative value. The court's ruling assumed that the government would be barred from using a *Pinkerton* theory to establish Edmond's responsibility for the murder. That assumption is no longer correct in light of our decision.

We therefore vacate the court's order excluding evidence of the conspiracy. The court's judgment reducing the charge against Edmond to second-degree murder while armed and the court's order barring the government from using a *Pinkerton* theory, are reversed and the case is remanded for further proceedings consistent with this opinion.

The court commends Plato Cacheris, Esq., who was appointed by this court, and his co-counsel, Philip J. Inglima, Esq., for their able presentation on Edmond's behalf.

*Reversed and remanded.*

SILBERMAN, Circuit Judge, dissenting:

I concur with the majority opinion except with respect to Part II. I respectfully dissent from the reversal of the district court's determination that D.C. law would not authorize the conviction of Edmond for first-degree murder as an aider and abettor of a principal defendant who was convicted only of murder in the second degree.

I would have thought it unquestioned that we are obliged under prior precedent to follow the D.C. Court of Appeals' interpretation of D.C. law as if it were the highest court of a state. *Hall v. C & P Tel. Co.*, 793 F.2d 1354, 1358–59 (D.C.Cir. 1986), *reh'g denied*, 809 F.2d 924 (D.C.Cir. 1987). And when we read and apply opinions of the D.C. Court of Appeals—whatever our own views of their merits—it is incumbent upon us to do so respectfully. Otherwise, we are not paying full deference to the deliberations of a sister court

whose determinations on such questions are binding upon us. Examining the D.C. Court of Appeals' opinion in *Morriss* in that spirit, I think it yields an interpretation correctly followed by the district court.

*Morriss* is an application of D.C.Code § 22–105 which authorizes aiders and abettors to be charged as principals (although the D.C. Court of Appeals never actually mentioned the section). The majority refers to this statute as using plain language which dictates the result *it* reaches. But one should note that the words of the statute are actually silent on the question before us—whether an aider or abettor can be convicted of a more serious crime than a principal. The Supreme Court in *Standefer*, interpreting a similar federal statute, decided that the aider and abettor could be convicted even when the principal has been acquitted. I quite agree with my colleagues that if *Standefer* controlled this case there would be little question but that the district court should be reversed. But *Standefer* does not control, *Morriss* does, and whatever the Supreme Court's reserved authority to reject a D.C. Court of Appeals decision on D.C. law, we have no such latitude.[1] Therefore, if the D.C. Court of Appeals rejects or modifies *Standefer* we are obliged to honor the position of the court of appeals.

I think, as did the district court, that the court of appeals refused to apply the logic of *Standefer* in *Morriss*. There, the court reversed the convictions of the principals because the inculpatory statement of the aider and abettor (Morriss) was improperly (in the court's view) admitted without adequate efforts to edit the statement so that it would not be prejudicial to the principals. There was absolutely no question as to the propriety of the statement's admissibility against Morriss. Nevertheless, the court of appeals reversed his conviction as well.

1. The Supreme Court has reserved for itself the power to disregard such a decision when it rests on an "egregious error." *See Pernell v. Southall Realty*, 416 U.S. 363, 369, 94 S.Ct. 1723, 1726, 40 L.Ed.2d 198 (1974). But it has never stated that we may do likewise, and it has long been our settled policy to accept fully D.C. law as interpreted by D.C. courts in order to prevent "two courts—neither of which could review the other's decisions" from independently formulating the District's law. *Lee v. Flintkote*, 593 F.2d 1275, 1278 n. 14 (D.C.Cir.1979); *see also Hall*, 793 F.2d at 1358 n. 9.

The court explained: "We do not think, therefore, that under the case as presented by the government, Morriss' conviction can *fairly* stand in the wake of trial error in the convictions by the same jury of the primary participants...." *Morriss v. United States,* 554 A.2d 784, 790 (D.C. 1989) (emphasis added). These words seem to me to reflect discomfort with the notion that the aider and abettor's actions should be judged wholly independently of the principal's guilt or innocence. To be sure, the court of appeals cited *Standefer,* seemingly approving its holding that an acquittal of the principal does not prevent conviction of the aider and abettor, but the court seemed unwilling to extend the *Standefer* reasoning to the case before it. The authority upon which the court of appeals relies in reversing Morriss' conviction is not—at least not explicitly—its interpretation of § 22–105, but rather D.C.Code § 17–306 (1981) giving the court authority to issue orders "just in the circumstances," *Morriss,* 554 A.2d at 79, which means, I take it, that the court is relying on a general equitable authority to shape its application of § 22–105.

The majority suggests, drawing upon a footnote in the opinion, that the court of appeals may have been concerned with an "evidentiary" difficulty regarding Morriss' conviction. Maj.Op. at 265. Actually, the footnote stating that the court could not "tell how the jury interrelated factors in determining the guilt of *each* of the three defendants," *Morriss,* 554 A.2d at 790 (emphasis added), seems to ascribe to the jury the same potential concern that the court apparently felt—doubts regarding the fairness of convicting an aider and abettor *if* the principal were not convicted (or were convicted of a lesser charge). Since the only evidentiary problem in the case was the inadmissibility of Morriss' statement vis-a-vis the principals, it is absolutely impossible for the court to have "thought the jury might somehow have misused *Morriss'* statement in finding *him* guilty." Maj.Op. at 266 (emphasis added). The majority speculates, Maj.Op. at 265–266, that the jury might have found Morriss guilty *because* the principal was guilty, but that is merely another way of phrasing the same issue—whether the guilt of the aider and abettor can and should be judged wholly independently of the guilt of the principal.[2]

The majority brushes aside the perceived inconsistency between the reversal of Morriss' conviction and the rule of law recognized in *Standefer* as indicating at most that the *Morriss* court "misapplied the settled law of aiding and abetting." Maj. Op. at 266. It is suggested, in effect, that the *Morriss* court got it wrong, that is, misinterpreted D.C.Code § 22–105. As the majority puts it, a departure from *Standefer* would be "totally at odds with [the] plain language [of § 22–105], the manifest intention of Congress, the extensive history of this and other congressional legislation examined in *Standefer,* and a line of cases construing § 22–105 going back as far as 1907."[3] Maj.Op. at 266. But it is clearly contrary to precedent to suggest that the Supreme Court's construction of a *federal* statute would bind the D.C. Court of Appeals to any particular interpretation of its local statute or that we, who must defer to the District of Columbia Court of Appeals' construction, are free to reject that reading and substitute the "correct" construction

---

**2.** The majority has got the D.C. Court of Appeals' concern about the jury following the district court's instructions backwards. The court was worried that the jury used Morriss' statement against the *principals* because of inadequate efforts to edit the statement. *Morriss,* 554 A.2d at 787.

**3.** The line of cases to which the majority refers starts in 1907 with *Maxey v. United States,* a case decided by the predecessor of *this court,* and the "line" is by no means as clear as is suggested. For instance, in *Maxey* (an abortion case), we approved a jury instruction requiring

that the jury find the principal, Maxey, guilty *before* convicting the aider and abettor, *Maxey v. United States,* 30 App.D.C. 63, 80 (1907), and, in *Hackney,* the D.C. Court of Appeals only observed that since the defendant under the D.C. statute could be liable as a principal, any error in charging him as an aider and abettor was harmless, *Hackney v. United States,* 389 A.2d 1336, 42–44. *Hackney* has nothing to do with *Standefer's* application or scope. The other cases the majority cites are also all pre-*Morriss* (indeed, pre-*Standefer*) decisions.

of the federal statute or our own interpretation of the D.C.Code.[4] *Cf. Cole v. Young*, 817 F.2d 412, 428–433 (7th Cir. 1987) (Easterbrook, J., dissenting) (federal court is not free to ignore state court decision when state court did not explain departure from prior precedent even if construction of state statute is thought wrong). Nor are we free to determine for ourselves whether *Morriss* is consistent with cases decided by this court before 1971 (the effective date of the D.C. Court Reform Act), which the D.C. Court of Appeals, as a matter of its choice, treats as part of its case law. In any event, as I have said above, the D.C. Court of Appeals did not rest its opinion only on an interpretation of § 22–105, and therefore our construction of that section either before 1971 or now would appear quite irrelevant. The precise reasoning the court of appeals follows may be, as the majority suggests, "obscure," Maj.Op. at 265, but there can be little doubt that our colleagues declined to apply the *Standefer* principle in the *Morriss* case. Under those circumstances, I believe we should recognize that under D.C. law *Standefer* is not given the same scope we would afford it.

That is not to say that I disagree with the majority's historical exegesis of the law of aiding and abetting or even its implicit criticism of the reasoning of the *Morriss* court, but for that matter I would not have voted to reverse the Morriss conviction. I do not think that is the question for us, however. Whether we must follow the D.C. Court of Appeals' opinion in *Morriss*—that is the question.

Even if I were wrong about whether the *Morriss* court declined to apply the reasoning of *Standefer* and thus departed from our understanding of federal aiding and abetting law, it cannot possibly be denied that *Morriss* is difficult to interpret. Accordingly, D.C. law is, at the very least, unclear on the point. The question whether an aider and abettor can be tried for first-degree murder when the principal has previously been found not guilty of first-degree murder has never been decided by any District of Columbia court. Under those circumstances, we are bound to defer to the district court's reading of *Morriss, see, e.g., Hull v. Eaton Corp.*, 825 F.2d 448, 454 n. 9 (D.C.Cir.1987),[5] if we do not certify the question to the D.C. Court of Appeals. *See, e.g., Nello L. Teer Co. v. Washington Metropolitan Area Transit Auth.*, 921 F.2d 300 (D.C.Cir.1990). The one thing we cannot do is to dismiss as aberrations both *Morriss* and the district court's reading of it.

\* \* \* \* \* \*

This court has assiduously sought to discourage litigants from attempting to obtain a more sympathetic reading of D.C. law by bringing an action in the federal court. *See, e.g., Delahanty v. Hinckley*, 845 F.2d 1069, 1070 (D.C.Cir.1988); *Anchorage-Hynning & Co. v. Moringiello*, 697 F.2d 356, 360–61 (D.C.Cir.1983). Our district court, to be sure, affords litigants certain structural advantages over the D.C. Superior Court. But that is all the more reason

---

4. This court owes "virtually the same deference to the D.C. Court of Appeals' construction of [a local statute] as we would accord a decision of the highest court of a State interpreting state law," even when the statute in question is *identical* to a federal statute, so long as it is passed as a "local" law. *Hall v. C & P Tel. Co.*, 809 F.2d 924, 925 (D.C.Cir.1987) (per curiam). As we explained, the local statute, even if identical to a federal law, is passed by Congress for a different purpose and under a different constitutional power—that of Art. I, § 8, cl. 17—which gives Congress plenary authority to provide for the citizens of the District of Columbia as a state provides for the welfare of its citizens. *See Hall v. C & P Tel. Co.*, 793 F.2d 1354, 1358–59 (D.C. Cir.1986), *reh'g denied*, 809 F.2d 924 (D.C.Cir. 1987).

5. All circuits, except the Third and Ninth, follow the "rule of deference"—that an appellate court will give special deference to a district court on unsettled questions of the law of the state in which the district court sits. *See* Coenen, *To Defer or Not to Defer: A Study of Federal Circuit Court Deference to District Court Rulings on State Law*, 73 MINN.L.REV. 899, 963–1021 (1989). *See also* Woods, *The Erie Enigma: Appellate Review of Conclusions of Law*, 26 ARIZ.L.REV. 775, 778–81 (1984). The Supreme Court has granted *certiorari* to resolve the split between the circuits. *Salve Regina College v. Russell*, — U.S. ——, 110 S.Ct. 3269, 111 L.Ed.2d 780 (1990).

why we must be careful to withstand efforts to have us put an unwarranted gloss—one the D.C. Court of Appeals would not likely paint—on D.C. law in a case in which we are bound by D.C. law. That self-restraint must govern equally in a case where the federal government is the prosecutor or where the plaintiff is a private litigant. This is a murder case originally appended to a federal drug conspiracy charge, but subsequently severed. It could and normally would have been brought in the D.C. Superior Court. The defendant should not be prejudiced as a matter of substantive D.C. law merely because the case was brought in the federal district court.

I am afraid that the majority's opinion is redolent of an earlier time, a time when we had supervisory review over the local courts. Congress, however, rejected that old regime and in the interest of the District's autonomy gave the District of Columbia a judicial structure which approached that which a sovereign state enjoys. It is, in my judgment, unfortunate for us to appear to resist that development by discounting an opinion of the highest court of the District as not authoritative.