Charles R. HOWARD, Jr., Appellant,

v.

UNITED STATES, Appellee.

Ronald WILLIS, Appellant,

v.

UNITED STATES, Appellee.

Nos. 92–CF–1019, 92–CF–1200.

District of Columbia Court of Appeals.

Argued Sept. 28, 1994.

Decided Feb. 6, 1995.

As Amended Feb. 23 and
March 30, 1995.

Douglas Wham, appointed by the court, for appellant Howard.

Monoranjan Bezboruah, appointed by the court, for appellant Willis.

Robert T. Swanson, Asst. U.S. Atty., with whom Eric H. Holder, Jr., U.S. Atty., and John R. Fisher, Roy W. McLeese, III, and Robert Walker, Asst. U.S. Attys., were on the brief, for appellee.

Before WAGNER, Chief Judge, and FERREN and TERRY, Associate Judges.

FERREN, Associate Judge:

A jury convicted Charles Howard and Ronald Willis on two counts each of assault with intent to murder while armed, D.C.Code §§ 22–503, –2403, –3202 (1989 Repl. and 1994 Supp.), two counts each of possession of a firearm during a crime of violence, *id.*, § 22–3204(b), one count each of carrying a pistol without a license, *id.*, § 22–3204(a), two counts each of possession of an unregistered firearm, *id.*, § 6–2311(a) (1989 Repl.), and two counts each of unlawful possession of ammunition, *id.*, § 6–2361(3). In this consolidated appeal, both appellants contend the trial court erred in refusing to instruct the jury on self-defense and in excluding evidence of the complainant's prior assaultive acts against Howard. Willis also argues the trial court erred in denying his motion for a judgment of acquittal; he claims the evidence was insufficient to prove beyond a reasonable doubt that he was an aider and abettor, let alone a principal. Finally, Howard contends the trial court erred in three other ways: precluding all communication between Howard and his counsel about information that allegedly showed a government witness's potential bias; restricting Howard's right to cross-examine the witness about his

potential bias; and instructing the jury on transferred intent.

We conclude that the trial court erred by excluding the proffered evidence of the complainant's prior assaultive acts against Howard. This exclusion also substantially affected Willis's defense against charges that he had aided and abetted Howard. Accordingly, because the court's error was of constitutional magnitude and was not harmless beyond a reasonable doubt, we must reverse appellant's convictions for assault with intent to murder while armed and remand as to those charges. We affirm as to all other counts.[1]

## I.

On the evening of February 11, 1991, Lonnie Boone and Derrick Ross were at the Farmers' Market in Southeast Washington. As Boone was coming out of a small liquor store at about 9:30 p.m., he saw appellants Howard and Willis. There was conflicting testimony about what happened next. According to Boone's testimony at trial, Howard cut in front of Boone as Boone was walking toward a telephone and said to Boone, "I heard you and Kevin supposed to be—try and kill [me]." Boone replied, "[W]ho told you that?" At that point, as Boone continued to walk toward the telephone, Howard swung and hit him in the ear. Boone then ran out of the Farmers' Market and up a hill toward his home. On the way home, Boone met a friend, Marvin (Kevin) Womack. He told Womack about his encounter with Howard. The two were soon joined by Derrick Ross.

Appellant Howard's version of the same events was slightly different. He testified at trial that when he saw Boone and Ross coming out of the liquor store, he called Boone over and asked him, "Why did they try to kill me?" Boone replied that he did not know what Howard was talking about, to which Howard responded, "I saw y'all. I saw y'all when y'all was—y'all had shot at me one day." Boone answered, "that wasn't me, that

was Kevin [Womack]." Howard then said, "[Y]ou was with him," and Boone reiterated, "I wasn't with him." On direct examination, Howard did not mention swinging at Boone. On cross-examination, however, Howard testified that, after the exchange of words, he and Boone were "about to fight." He said, they swung at each other and missed; Boone then ran away.

Howard further testified that, after Boone had run away, Willis told Howard that he had seen Derrick Ross take a gun out during Howard's altercation with Boone. Howard and Willis then left the Farmers' Market and went to Howard's house. They retrieved a sawed-off shotgun and a .25 caliber semiautomatic pistol from under some dirt in Howard's back yard.

Howard and Willis then drove to Boone's house. Howard testified that their purpose was to "just call everything off and let everything be. I mean let it be, let's not have no problems." Howard added that the reason for taking the weapons was "[b]ecause I know these guys and Derrick [Ross] had a gun, and I was not going around there without my protection." According to Howard, when they arrived at Boone's house, he and Willis got out of the car and began walking up the street. Howard was carrying the sawed-off shotgun concealed beneath his coat; Willis was carrying the pistol.

As Howard and Willis were walking, they saw Kevin Womack, Lonnie Boone, and Derrick Ross in a parking lot some distance ahead of them. There was conflicting testimony about what happened next. According to the government's witnesses, Boone and Womack, when the parties were about twenty feet apart, Howard said to Womack, "I heard you supposed to be beefing with me." Howard then pulled out the sawed-off shotgun. Womack replied, "I ain't got no beef with you" and began backing away. Womack testified that, as he was backing away, he was holding his hands up. At this point, according to Womack, Boone cut in front of Womack and began running. Womack fur-

---

1. As the government concedes in its brief, each appellant's convictions on two counts of possession of a firearm during a crime of violence merge into single violations. *See Bean v. United* *States,* 576 A.2d 187, 188–91 (D.C.1990); *Cormier v. United States,* 137 A.2d 212, 216 (D.C.1957). On remand, the trial court should revise the sentences accordingly.

ther testified that Howard then fired a shot that struck Womack in the shoulder. According to Boone, as Boone was running a second shot struck a metal gate near him. Both government witnesses testified that Howard then took the pistol from Willis and fired again at Boone. Boone testified that he kept running until he was across the street. When Boone looked back, he saw Howard standing within seven to ten feet of Womack, firing the pistol at Womack as he lay on the ground. Womack testified that, in addition to receiving his first wound, in the shoulder, he was hit twice in the back and a third time on the right side below the rib cage. Both Boone and Womack testified that they had not been carrying weapons at the time of the shooting.

Derrick Ross also testified for the government. He said that he had been carrying a weapon at the Farmers' Market but that he no longer had it when he met up with Boone and Womack. Ross also testified that Boone and Womack had not appeared scared when Howard first confronted them, and that Ross had concluded from their lack of fear that one of them had been holding a gun. On cross-examination, Ross testified that before Howard had shot Womack, Womack had made gestures that would have caused a policeman to shoot him.

Appellant Howard's description of the shooting was quite different from Boone's and Womack's. Howard testified for the defense that when he and Willis had encountered Womack, Boone, and Ross, Howard had been in front; Willis had been about ten feet behind him. When Howard had come within four feet of Womack, the two had had a brief conversation. At this time, according to Howard, the shotgun was completely concealed beneath his coat. Howard then testified that, during the conversation, Womack had been "wiggling" or rocking from side to side. Womack had "made a motion" as if "[h]e was grabbing a gun to try to shoot"; at the same moment Boone had "cut across." Howard acknowledged that he had drawn the shotgun and shot twice in the direction of Womack, but he had not shot at Boone, who was running away. Howard then had turned around and run toward Willis. When How-

ard reached Willis, who had been looking back toward Womack, Willis told Howard to watch out. Howard testified that, upon looking back, he had seen Womack pulling out "with his right hand, a black gun." Howard grabbed the pistol from Willis and fired quickly toward Womack. Howard did not recall how many shots he had fired. Howard testified that Womack had been standing up at the time. Howard and Willis then had left the area and returned to Howard's home.

## II.

We initially consider several contentions that can be disposed of briefly.

### A.

■ Appellant Willis contends the trial court erred in denying his motion for judgment of acquittal on all counts. This court may reverse the trial court's denial of such a motion only by finding that the evidence, viewed in the light most favorable to the government, is such that no reasonable juror could fairly find guilt beyond a reasonable doubt. *See Gayden v. United States*, 584 A.2d 578, 579–80 (D.C.1990) *cert. denied*, 502 U.S. 843, 112 S.Ct. 137, 116 L.Ed.2d 104 (1991); *Thompson v. United States*, 567 A.2d 907, 908 (D.C.1989); *Patterson v. United States*, 479 A.2d 335, 338 (D.C.1984). Willis argues that the evidence shows only that he was present and that proof of mere presence is insufficient to sustain his convictions for aiding and abetting assault with intent to commit murder while armed.

■ We cannot agree with Willis's view of the evidence. Howard testified that Willis had helped him dig up the weapons, accompanied him to Boone's house, held one of the guns, warned Howard that he was in danger, handed the gun to Howard so that he could shoot Womack, and left the scene with Howard. This evidence provides more than a sufficient basis for finding that Willis was not merely present but, rather, took actions that "facilitate[d] the unlawful deed." *Settles v. United States*, 522 A.2d 348, 357 (D.C.1987) (quoting *Bailey v. United States*, 135 U.S.App.D.C. 95, 98–99, 416 F.2d 1110, 1113– 14 (1969)). Willis's motion was properly de-

nied with respect to the weapons charges as well. *See Tucker v. United States,* 421 A.2d 32, 35 (D.C.1980).

## B.

Appellants both maintain that the trial judge erred in refusing to instruct the jury on self-defense. When a defendant raises a claim of self-defense, the trial court must decide, as a matter of law, whether there is record evidence sufficient to support the claim. *See Brown v. United States,* 619 A.2d 1180, 1182 (D.C.1992) (citing *Bowler v. United States,* 480 A.2d 678, 682 n. 8 (D.C. 1984)). Here, the trial court denied the requested instruction on the ground that, in the court's words, the defendants had put themselves "in a position where violence was likely to result." We find no error in this ruling.[2] We have repeatedly reaffirmed the principle that "[s]elf-defense may not be claimed by one who deliberately places himself [or herself] in a position where he [or she] has reason to believe his [or her] 'presence ... would provoke trouble.'" *Mitchell v. United States,* 399 A.2d 866, 869 (D.C. 1979) (quoting *Rowe v. United States,* 125 U.S.App.D.C. 218, 219, 370 F.2d 240, 241 (1966)); *see Harper v. United States,* 608 A.2d 152, 155–56 (D.C.1992); *Brown,* 619 A.2d at 1182; *Nowlin v. United States,* 382 A.2d 9, 14 n. 7 (D.C.1978). The trial court correctly applied that principle here.

After the confrontation at the Farmers' Market, Howard and Willis had returned to Howard's house, armed themselves with a considerable amount of firepower, and driven to Lonnie Boone's house. Thus, even if Kevin Womack had made the first move for a gun once Howard and Willis had arrived, armed, at Boone's house, the degree of initiative appellants had taken in creating the confrontation precluded a claim of self-defense. *See Brown,* 619 A.2d at 1182 (quoting *Rowe,* 125 U.S.App.D.C. at 219, 370 F.2d at 241) ("[a] defendant cannot successfully claim self-defense when 'he [or she] left an apparently safe haven to arm himself [or herself]

and return to the scene.'") Indeed, as we stressed in *Nowlin:*

> appellant had no legitimate claim to the defense of self-defense, *since he had voluntarily placed himself in a position which he could reasonably expect would result in violence.* Self-defense "is not available to one who finds trouble by going out of his way to look for it." R. Perkins, Criminal Law 1008 (2d ed. 1969).

382 A.2d at 14 n. 7 (emphasis added). These words apply to both appellants here.

## C.

Before trial, the prosecutor, out of concern for his obligations under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), informed the court and defense counsel that Derrick Ross was a suspect in an unrelated armed robbery, although there was no basis for believing that Ross was aware he was under suspicion. The court ruled that this information was too attenuated to fall within the demands of *Brady.* The court issued a protective order prohibiting defense counsel from discussing this information with appellant Howard and from using it as a basis for cross-examining Ross. On appeal, Howard contends that this protective order violated his Sixth Amendment right to counsel, as well as his rights under the Confrontation Clause. We find no abuse of discretion in the court's issuance of this protective order. *See United States v. Anderson,* 509 F.2d 724, 730 (9th Cir.1975) ("the district court can and should, when appropriate, place defense counsel under enforceable orders against unwarranted disclosure of the evidence that he has heard.") *cert. denied,* 420 U.S. 910, 95 S.Ct. 831, 42 L.Ed.2d 840 (1975).

There was no evidence that Ross knew of the potential charges. Thus, counsel's failure to disclose this possibility to Howard, let alone to cross-examine Ross about it, could have no material, adverse impact on the defense, for if Ross did not know he was a suspect, he had no reason to curry favor with the government by "improving" his testimo-

---

**2.** "In determining whether a defense instruction was properly denied, we review the evidence in the light most favorable to the defendant." *Reid v. United States,* 581 A.2d 359, 367 (D.C.1990) (quoting *Adams v. United States,* 558 A.2d 348, 349 (D.C.1989)).

ny for the government's benefit. If, on the other hand, cross-examination by defense counsel would have informed Ross that he was a suspect, such disclosure would have risked the very biased testimony counsel wished to avoid. Finally, even if, unbeknownst to court and counsel, Ross knew he was a suspect in an unrelated crime, his testimony did not evidence a pro-government bias; in fact, his testimony was helpful to appellant Howard. Ross testified that when confronted by Howard, both Womack and Boone had reacted in a way that suggested one of them was armed, and that, before the shooting, Womack had made gestures that would have caused a policeman to shoot him. It is therefore hard to see what the defense would have gained by attempting to impeach Ross's credibility.

### D.

■ Howard also contends that the trial court erred in instructing the jury on transferred intent. Taking the evidence in the light most favorable to the government, as we must, we find no merit in this argument. The trial court, referring to the government's evidence that Howard's first shot had been fired at the moment Boone was cutting in front of Womack, instructed the jury that if it found that this first shot was intended for Boone, it could transfer that intent to Wom-

ack and consider it in relation to the charge of assault with intent to murder Womack. · At trial, appellant Howard objected to this instruction on the ground that it was not supported by the evidence. On appeal, however, appellant has abandoned that argument; he contends only that *transferred intent* instructions no longer may be given in attempted murder cases in light of dictum in the recent Maryland Court of Appeals decision in *Ford v. State,* 330 Md. 682, 625 A.2d 984 (1993).[3] Appellant did not raise this argument at trial, which took place in the spring of 1992, over a year before *Ford* was decided.[4] We therefore review for plain error—an error "so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial." *Watts v. United States,* 362 A.2d 706, 709 (1976) (en banc); *see* Super.Ct.Crim.R. 52(b) (plain error).

■ We need not resolve here the question of *Ford's* applicability in this jurisdiction,[5] because, on the facts of this case, even if we were to adopt *Ford,* the trial court's transferred intent instruction did not approach plain error. The instruction was given solely with regard to the first shot fired by Howard. By his own account, however, Howard fired at Womack, with the intent to hit Womack, at least three more times. Thus, even if Howard's first shot was intend-

---

**3.** In *Ford,* 625 A.2d at 997–1001, the court said that when a non-fatal assault has been completed as to the intended victim (here, Boone), the doctrine of transferred intent should not be used to convict the defendant of an additional, specific intent assault against an unintended victim (here, Womack). More specifically, as applied in this case, *Ford* doctrine would hold that, if Howard had aimed his gun at Boone, intending to murder him, but had shot Womack instead (without killing him), Howard could only be convicted of assault with intent to murder Boone; his intent could not be transferred to Womack as well, allowing two convictions for one intended act. *Id.* 625 A.2d at 999.

> If the defendant charged with attempted murder, shot at but missed the intended victim, the defendant may still be convicted of attempted murder of that victim. The completed crime has been committed on the intended victim, and the fiction of transferred intent would not so much transfer the intent as replicate it and apply it to another victim.

*Id.* There is contrary authority to the effect that transferred intent may properly be employed to

convict a defendant of two non-fatal assaults: against the intended victim and also against an unintended victim who happened to get in the way. *See e.g., State v. Rodriguez–Gonzales,* 164 Ariz. 1, 790 P.2d 287, 288 (App.1990); *State v. Gillette,* 102 N.M. 695, 699 P.2d 626 (1985); *State v. Alford,* 260 Iowa 939, 151 N.W.2d 573 (1967); *State v. Thomas,* 127 La. 576, 53 So. 868 (1910).

**4.** If appellant believed the trial court should have instructed the jury according to the principles eventually enunciated in *Ford,* defense counsel could have presented that argument to the court based on pre-*Ford* case law from other jurisdictions. *See, e.g., People v. Calderon,* 232 Cal. App.3d 930, 936–37, 283 Cal.Rptr. 833, 836–37 (1991); *People v. Czahara,* 203 Cal.App.3d 1468, 1474–75, 250 Cal.Rptr. 836, 839–40 (1988); *People v. Birreuta,* 162 Cal.App.3d 454, 460–61, 208 Cal.Rptr. 635, 638–39 (1984); *State v. Martin,* 342 Mo. 1089, 119 S.W.2d 298 (1938).

**5.** *See Ruffin v. United States,* 642 A.2d 1288, 1293–95 & nn. 8–10 (D.C.1994).

ed for Boone, the jury need not have transferred that intent to Womack in order to find Howard guilty of assaulting Womack with intent to murder while armed. Indeed, the evidence of Howard's specific intent to assault Womack was overwhelming, negating any possible prejudice from the transferred intent instruction. There was no plain error here.

### III.

### A.

We turn, finally, to the principal issue on appeal. Both appellants contend the trial court erred in excluding evidence of Kevin Womack's prior assaultive acts against Howard. The disputed evidence consisted of proffered testimony by Howard and by one other witness, Fidel Braxton, concerning two occasions when Womack allegedly had committed aggressive acts against Howard. In mid-January 1992—three weeks before Howard shot Womack—Womack allegedly had shot at Howard as Howard was walking down the street. The previous summer, Womack allegedly had approached Howard with a gun "in a menacing, somewhat threatening way." [6]

At trial, before the defense opened its case-in-chief, the government told the court that it would seek to exclude all testimony about Womack's past acts against Howard on the ground that Howard had no foundation for a self-defense claim. The court replied that it would not decide whether Howard was entitled to a self-defense instruction until after Howard's direct testimony.

The defense sought, nonetheless, to open its case by calling Fidel [7] Braxton to testify

about the occasion when Womack had shot at Howard. Specifically, Braxton would have testified that he had seen Howard three or four weeks before the shooting in this case running down the street and had heard him "blurt[ing] out he had been shot at by Kevin and Lonnie." The court ruled that it would admit no testimony about such past acts until there was more evidence of self-defense. Defense counsel then offered to make an ex parte proffer of the substance of Howard's own anticipated testimony so that the court could decide whether there was a sufficient foundation for evidence relevant to self-defense. The court ruled that Howard had to testify first, and that until the court had decided whether there was a foundation for self-defense, neither Howard nor any other defense witness could testify about Womack's past assaultive acts against Howard.

Howard took the stand. After he had testified about the incidents of February 11, 1992 when he shot Womack—and also had mentioned that Womack had "shot at me one day"—the court ruled that, as a matter of law, appellant would not be entitled to a self-defense instruction. Accordingly, the court ruled it would not admit any testimony about Womack's prior assaultive behavior toward Howard to show that Howard had acted in self-defense on February 11.

During Howard's cross-examination, the government attempted to show that on the night of February 11 Howard had been the aggressor and, of significance here, that he had acted without provocation. [8] On redirect examination, defense counsel sought the court's permission, once again, to allow Howard to testify about Womack's prior aggressive behavior toward him—this time in order

---

**6.** Howard proffered his own testimony about both incidents and Braxton's testimony about the more recent shooting incident.

**7.** In the trial transcript this witness's name is "Fidel" Braxton. Appellant's reply brief refers to him as "Vernell" Braxton.

**8.** By testifying that Womack had shot at him on a prior occasion, and that he had only shot Womack after Womack had made a motion as if to grab a gun, Howard had introduced evidence of provocation into his case-in-chief. In this prosecution for assault with intent to murder while

armed, it was important for the government to prove lack of provocation, even without regard to any claim of self-defense, for when the issue of provocation is in the case—as it was here through appellant's direct examination—the government has the burden of proving, as an element of the crime, that there were no such circumstances mitigating a finding of malice. *See* Criminal Jury Instructions for the District of Columbia No. 4.10 (4th ed. 1993); *Logan v. United States*, 483 A.2d 664, 672–73 & n. 11 (D.C.1984); *see also Comber v. United States*, 584 A.2d 26, 40–41 & n. 17 (D.C.1990) (en banc).

to show not self-defense but provocation, and thus mitigation. The government objected on two grounds: that such testimony would go beyond the scope of cross-examination, and that this was simply an attempt to get around the court's earlier ruling that the prior incidents were inadmissible to show self-defense. Defense counsel replied that the prior incidents, even though excludable to show self-defense, were admissible for the legally separate purpose of showing provocation/mitigation. The court, however, sustained the government's objections.

### B.

 According to the standard criminal jury instructions, in order to convict a defendant of assault with intent to murder while armed (AWIMWA), the government must prove each of four elements beyond a reasonable doubt: (1) the defendant assaulted the complainant; (2) the defendant did so with specific intent to kill the complainant; (3) there were no mitigating circumstances (in cases where there is sufficient evidence of provocation); and (4) at the time of the commission of the offense the defendant was armed. Criminal Jury Instructions for the District of Columbia Nos. 4.03, 4.10 (4th ed. 1993) (hereafter "Redbook"); *See Hunter v. United States,* 590 A.2d 1048, 1051 (D.C. 1991); *Logan,* 483 A.2d at 672–673 n. 11.[9]

 Implicit in this enumeration of the AWIMWA elements is the long recognized requirement that, in order to convict a defendant of assault with intent to murder, the government must prove that the defendant acted with malice. *See Logan,* 483 A.2d at 673 ("[s]tatutes proscribing the offense of assault with intent to commit murder ... uniformly have been read to require proof of malice"); *id.* at 672 n. 10 ("[m]alice is a necessary element to constitute an assault with intent to murder") (citation omitted).

This requirement is now embodied in the third element stated in the jury instructions, in that the government must prove the *absence* of mitigating circumstances because the *presence* of mitigating circumstances may preclude a finding of malice. *See Comber v. United States,* 584 A.2d 26, 41 (D.C.1990) (en banc) ("[l]egally recognized mitigating factors serve to extenuate or 'dampen' ... the otherwise malicious nature of the perpetrator's mental state") (citation omitted). Thus, where, as here, a defendant has introduced evidence of provocation, the government must prove its absence beyond a reasonable doubt in order to show malice and convict the defendant of AWIMWA. *See Logan,* 483 A.2d at 672–73 & n. 11. As we explained in *Comber:* "[T]he absence of justification, excuse, or mitigation is thus an essential component of malice, and in turn of second degree murder, on which the government bears the ultimate burden of persuasion." 584 A.2d at 41; *see also Mullaney v. Wilbur,* 421 U.S. 684, 704, 95 S.Ct. 1881, 1892, 44 L.Ed.2d 508 (1975) ("We therefore hold that the Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case.")

 The lesser included offense of assault with intent to kill while armed (AWIKWA) is comprised of the first, second, and fourth elements of AWIMWA. Redbook Nos. 4.03, 4.09; *See Logan,* 483 A.2d at 672. If a jury finds that the third element of AWIMWA—absence of mitigating circumstances [10]—has not been proved beyond a reasonable doubt, the jury may not convict of assault with intent to murder while armed (AWIMWA); it may find guilt only of a lesser offense, such as assault with intent to kill while armed (AWIKWA) or assault with a dangerous weapon (ADW). *See* Redbook

---

9. Although the trial took place in late February and early March of 1992, Judge Wolf's instructions to the jury on AWIMWA, AWIKWA, and lesser included offenses were the same as those in the 1993 Redbook.

10. The Redbook, No. 4.10, defines mitigating circumstances as follows:

Mitigating circumstances exist where a person acts in the heat of passion caused by adequate provocation. Heat of passion includes rage, resentment, anger, terror, and fear. A person acts upon adequate provocation if his/her action is provoked by conduct that would cause an ordinary, reasonable person in the heat of the moment to lose his/her self-control and act on impulse and without reflection.

Nos. 4.07 (ADW), 4.03 & 4.09 (AWIKWA); *United States v. Hobbs*, 594 A.2d 66, 69 (D.C.1991); *Logan*, 483 A.2d at 672–73 & n. 11.[10A]

■ It is important to note, moreover, that the evidence of provocation that will be adequate for mitigating the malice required for AWIMWA, and thereby reduce the degree of criminality, need not be enough to justify a self-defense instruction that would justify the killing altogether. *See Comber*, 584 A.2d at 41. The evidence of provocation need only be enough to justify a jury's reasonable belief that the defendant was guilty of AWIKWA, not AWIMWA, because the defendant's action had been "provoked by conduct that would cause an ordinary, reasonable person in the heat of the moment to lose his/her self-control and act on impulse and without reflection." Redbook, No. 4.10, *supra* note 9; *see Comber*, 584 A.2d at 41.

According to the defense theory, Howard and Willis had sought out Womack and Boone for the purpose of making peace with them. Howard testified that, when he and Willis had encountered Womack and Boone in the parking lot, Womack had "made a motion" as if "[h]e was grabbing a gun to try to shoot." Howard further testified that he had shot Womack in response to that gesture and later had fired the handgun at Womack because Howard "thought [Womack] was trying to get another gun." Howard stressed he "was sure [Womack] had another—the gun on him and he had turned to fire another time."

Apparently intending to buttress his testimony that he had been provoked to shoot out of fear—a circumstance mitigating malice— Howard testified, and defense counsel argued to the jury, that Howard had reminded Lonnie Boone earlier on the day of the shooting that Boone and Womack had " 'shot at me one day,' " to which Boone had replied, " 'That wasn't me. That was Kevin [Womack].' "

In addition, defense counsel again proffered testimony by Fidel Braxton about Womack's alleged gunshot at Howard three weeks earlier. Counsel also proffered testimony that, during the previous summer, Womack had menaced Howard with a gun. The trial court, however, again denied admission of this evidence, this time on the grounds that it went beyond the scope of cross-examination and that direct examination would not be reopened. This is the ruling that appellant challenges here.

To support the trial court's ruling, the government offers one basic argument: the judge's rationale was purely procedural—a refusal to reopen direct examination for consideration of an issue (provocation) beyond the scope of cross-examination—and this ruling did not amount to an abuse of discretion. The government buttresses its argument by stressing that appellant failed to object on procedural grounds either at trial or in its opening brief on appeal; that this failure amounted to a waiver of the procedural argument; and that, even absent a waiver, appellant's failure to state a procedural objection at least limits this court to review for plain error, of which there was none.

It is important to note that, in relying on this procedural argument, the government acknowledges in its brief that provocation is a legal issue wholly separate from self-defense, and that particular "past acts" evidence may be relevant and admissible as to provocation even if not sufficient for admissibility as to self-defense. On the other hand, the government suggests, inconsistently, that

**10A.** "In suggesting that the jury could have found guilt of the lesser offense of AWIKWA, we are not saying that AWIKWA is a necessarily lesser *included* offense of AWIMWA. That question has not been conclusively answered. Although, as indicated earlier in the text, the standard criminal jury instructions include the "specific intent to kill" as an element of AWIMWA, as well as of AWIKWA, we have never held that a specific intent to kill is the only species of malice that will qualify for AWIMWA. If at least one other type of malice qualifies, such as "a specific intent to inflict serious bodily harm" or "a wanton and willful disregard of an unreasonable human risk," *Comber v. United States*, 584 A.2d 26, 41 (D.C.1970) (en banc), then it will be possible to commit AWIMWA without committing AWIKWA (which of course, requires a specific intent to kill), and thus the latter will not be a lesser included offense of the former. *See also Logan*, 483 A.2d at 671 ("malice may be found '[e]ven when there is no intent to kill.' ") (citation omitted)."

in seeking, for a second time, to introduce the evidence of provocation that the trial court declined to admit under a self-defense theory, appellant in effect was asking for reconsideration of the court's prior ruling that the "past acts" evidence should not be admitted, and that the trial court had no obligation to grant reconsideration.

The government's position is untenable. In the first place, appellant was not seeking to reopen the trial court's earlier ruling that the proffered "past acts" would not be admissible to support a self-defense instruction. Counsel could not have been clearer. He explained to the court, before completing Howard's redirect examination, that the defense was seeking admission of the "past acts" evidence, in the alternative, to show provocation, a wholly separate theory of admissibility.

> MR. WHAM: Your Honor, I want to take one more stab at some of these issues, but in a slightly different way, and I think this might be the time to do it. It will take the least amount of time. I would want to ask Mr. Howard, at this point, a few more questions on the things that he said and heard in response when he first faced Boone and Womack, but I know that gets somewhat to the issue that the Court has ruled out.
>
> \* \* \* \* \* \*
>
> THE COURT: Any objection?
>
> MR. WALKER: I believe it's beyond the scope, Your Honor, and I think, at this point, it's just an attempt to get around the Court's ruling in this area.
>
> MR. WHAM: Well, it could be construed that that's why I didn't want to go and do it—
>
> THE COURT: Thank you.
>
> MR. WHAM: —but the other justification is this, Your Honor. *I also am going to ask the Court to allow us to get into that particular issue and, also, the issue about the confrontation three weeks earlier with Kevin Womack and the showing of a gun by Kevin Womack several months before that, on the theory that even if there is no self-defense, these things are relevant to*

> *mitigation for provocation and those are still relevant issues.*
>
> By the same token, I would ask the Court to present the evidence of other witnesses on those topics under that theory.
>
> \* \* \* \* \* \*
>
> MR. WHAM: Not—I think the point is this, Your Honor. It does kind of point up the difficulty with ruling out self-defense. As Mr. Walker has said, these issues are very relevant to self-defense. *They're also relevant to mitigation for provocation. The question is, when you take out self-defense, do you just remove mitigation for provocation, and I think it's clear the answer is no.* So how can you present evidence on the mitigation for provocation aspect?
>
> THE COURT: We're done. No more questions beyond the scope.
>
> MR. WHAM: Okay. Is the Court ruling on the rest of this issue at this point or just the—
>
> THE COURT: It's too late. I'm not going to completely reopen direct examination. Thank you.
>
> \* \* \* \* \* \*
>
> THE COURT: ... Now, Mr. Wham, where do we go next? Do you have additional witnesses in light of my ruling?
>
> MR. WHAM: No, Your Honor, we have no other witnesses. *I just did want to make sure I understood the Court also overruled the request to put on the witnesses in additional areas on the issues of mitigation for provocation.*
>
> THE COURT: *Yes.*

(Emphasis added.) The government, therefore, is incorrect in claiming that appellant was trying to retrace old ground.

Furthermore, the government's procedural justification of the trial court's ruling altogether misses the point. Even if we assume, solely for the sake of argument, that the court did not abuse its discretion in declining to permit expansion of Howard's redirect examination beyond the scope of cross-examination, *see Hairston v. United States,* 497 A.2d 1097, 1103 (D.C.1985), or in declining to

authorize reopening of his direct examination, *see Woodward v. United States,* 626 A.2d 911, 913 (D.C.1993), the defense proffer of provocation evidence—as the government candidly acknowledges in its brief—did not depend on Howard's own testimony. For example, counsel made clear that he wished to call Fidel Braxton to the stand to testify about Womack's gunshot at Howard three weeks earlier. Because the defense had not rested its case, this additional witness would not have required the court to reopen anything.[11]

 The point is, the trial court erred in declining to permit the defense to introduce evidence of provocation on the ground that this would have required the court to reopen Howard's direct examination and even to revisit the court's "past acts" ruling. Neither is true. The defense proffered the testimony of a witness other than appellant Howard on the question of provocation, and the court's prior ruling related only to self-defense, not to the separate provocation issue.

As indicated earlier, Howard testified on direct examination that Womack had previously shot at him, and that on February 11 he had shot Womack only because he had thought Womack was about to grab a gun. Because this testimony introduced evidence of provocation, it triggered the government's burden of proving the absence of mitigating circumstances beyond a reasonable doubt. *See* Redbook No. 4.09; *see also Logan,* 483 A.2d at 672 n. 11 (D.C.1984) ("[o]nce the issue of provocation, justification, or excuse is in the case, the government must prove its absence beyond a reasonable doubt in order to show malice"). As the government itself concedes, the prior incidents were "relevant to the question whether appellant Howard acted with malice or instead acted in the heat of passion caused by adequate provocation." Accordingly, there was no procedural justification for excluding the testimony of defense witnesses that was relevant to provocation/mitigation, and appellant—whose counsel clearly preserved the provocation issue at trial—cannot be faulted for failing to make an irrelevant procedural objection. The trial court clearly erred; the remaining issue is whether that error was harmless.

**C.**

 Although the exclusion of evidence is largely a matter of trial court discretion, *see Johns v. United States,* 434 A.2d 463, 473 (D.C.1981), that discretion "must be weighed against the constitutional rights of a defendant to present a defense." *Clark v. United States,* 639 A.2d 76, 81 (D.C.1993) (citing *Bassil v. United States,* 517 A.2d 714, 716 (D.C.1986)). Here, the trial court denied Howard the right to present evidence that went directly to an element (malice) of the most serious crimes with which he and Willis were charged. The government has conceded in its brief that the excluded testimony was relevant to the issue of provocation/mitigation. The right to present witnesses on an issue central to the defense case is inherent in the Fifth Amendment right to due process, *see Washington v. Texas,* 388 U.S. 14, 18, 87 S.Ct. 1920, 1922–23, 18 L.Ed.2d 1019 (1967); *Bassil,* 517 A.2d at 716, and in the Sixth Amendment right of compulsory process for obtaining witnesses in the defendant's favor. *See United States v. Davis,* 639 F.2d 239, 244 (5th Cir.1981), *cited in Bassil,* 517 A.2d at 716. We therefore must consider whether the trial court's error in denying appellant the right to call witnesses on provocation/mitigation was (1) a constitutional error requiring reversal unless the government

---

11. In recognizing this reality, the government argues in its brief that, even with this scenario, some reopening of testimony would have been required: "if the trial court had permitted other witnesses to testify to the prior incidents, it surely would in fairness have been required to permit the government to reopen its cross-examination to question appellant Howard about [those] incident[s]." Presumably such reopening would have been a matter of trial court discretion, just as reopening Howard's direct or redirect examination would have been discretionary, according to the government itself. If, however, the government is correct in its assertion that, "in fairness," it would have been entitled to reopen Howard's cross-examination (an issue we need not decide), then presumably, in fairness, Howard would have been entitled to testify on reopened redirect examination—subject to recross—about any prior incidents, relevant to provocation, that Howard had not mentioned on direct or cross and had not been introduced through other defense witnesses.

shows it was harmless beyond a reasonable doubt under *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), or (2) non-constitutional error subject to reversal under *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946) (requiring reversal unless court can say "with fair assurance, after pondering all that happened without stripping the [allegedly] erroneous action from the whole, that the judgment was not swayed by the error").

As we explained in *Clark:*

Where ... the trial court's evidentiary ruling *wholly deprived* the defendant of *any opportunity* to cross examine a witness *or present evidence concerning* bias or *a central issue in the case,* we may only affirm if we are convinced that the error was harmless beyond a reasonable doubt, applying the test set forth in *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

639 A.2d at 81 (footnote omitted) (emphasis added). On the other hand:

If the issue is merely collateral, or *where ample* cross-examination has already been allowed or *evidence admitted on a particular issue,* trial court curtailment of the defendant's presentation does not implicate the defendant's Sixth Amendment rights, and we apply the less stringent test for harmless error set forth in *Kotteakos* ...

*Id.* at 82 (citations omitted). Here, Howard was able to introduce only his own cryptic reference to Womack's alleged gunshot at him; Howard testified that he had said to Lonnie Boone, "I saw y'all. I saw y'all when y'all was—y'all had shot at me one day.'" Howard, however, was forbidden to testify further himself about the circumstances of the alleged shooting, with the result that the jury was not permitted to hear and evaluate the details for their bearing on Howard's state of mind—and thus on provocation/mitigation—when Howard shot at Womack on February 11. Howard also was forbidden to introduce his own testimony that Womack had threatened him with a gun the previous summer. Finally, the trial court refused to permit the testimony of another defense witness, Fidel Braxton, see *supra* note 4, who would have provided a contemporary account of the alleged gunshot at Howard three weeks earlier by confirming that Howard, while running down the street, had "blurted out he had been shot by Kevin and Lonnie."[12] Braxton, therefore, would have provided independent testimony about the occasion on which Womack shot at Howard, which very likely would have appeared to the jury as less self-serving, and thus more credible, than Howard's own testimony about the incident.

▇▇▇▇ It is true, of course, that Howard himself, while testifying, managed to make one cryptic reference to Womack and Boone ("y'all had shot at me one day"), and that for this reason we cannot literally say that Howard was "wholly deprived" of "any opportunity" to "present evidence concerning ... a central issue in the case." *Clark,* 639 A.2d at 81. But that testimony was so cryptic—so devoid of details, including a time reference—that we also cannot say Howard had any meaningful opportunity to present his evidence on provocation/mitigation. He was not allowed to present, through his own testimony, any cogent explanation of what had happened a few weeks earlier (or of what had happened nine months earlier when Womack had showed him a gun in a threatening manner). Even more importantly, Howard was prevented from calling Braxton to testify that Howard had spontaneously exclaimed, three or four weeks earlier, that Womack had just shot at him. In short, Howard was not allowed to present the "ample" evidence, *id.* at 82, on the provocation/mitigation issue that would justify our application of *Kotteakos,* rather than *Chapman,* harmless error.

---

12. The government suggests that Braxton's testimony would have been "hearsay of uncertain admissibility" and argues that its exclusion was harmless for that reason. We cannot agree. The government does not say the supposed hearsay definitely would have been inadmissible; we are not told, in particular, why the evidence would not have been admissible under an exception to the hearsay rule as reflecting, for example, a spontaneous utterance. In any event, the trial court never reached the question whether Braxton's testimony would have been excludable hearsay, and we shall not so speculate.

We therefore turn to the *Chapman* inquiry. When the serious crime of assault with intent to murder is charged, the issue of provocation—when supported by solid evidence—not only is inherently central to the defense case but also may very likely be resolved by evidence independent of the defendant's own say-so. The government, therefore, as well as our own dissenting colleague, cannot properly ignore the trial court's refusal to permit Howard's own testimony about provocation, and also dismiss Howard's proffer of Braxton's testimony, as merely a meaningless proffer of cumulative evidence. That approach to harmlessness relies on the admission of relatively weaker evidence—Howard's cryptic reference to the earlier shooting—as the basis for excluding ostensibly much stronger evidence. That is not a sound basis for calling the trial court's exclusion of the most credible defense evidence on the provocation issue harmless, let alone harmless beyond a reasonable doubt.[13] Furthermore, even though the government's case against Howard was strong, the impact of the excluded provocation evidence might well have mitigated the jury's finding of malice, leading to conviction of a lesser offense, if not acquittal.

▮ In sum, given the centrality of the proffered testimony to the defense, as well as its relative strength bearing on the provocation issue, and further given the potential importance of provocation evidence on the ultimate outcome despite the strength of the government's case, we cannot say that the erroneous exclusion of the proffered testimony on provocation/mitigation by Howard and by Fidel Braxton was harmless beyond a reasonable doubt as to Howard.

### D.

We turn now to the effect on appellant Willis of our decision to reverse appellant Howard's AWIMWA convictions. Willis was convicted of aiding and abetting Howard in the assaults on Womack and Boone. The reversal of a principal's conviction does not necessarily mandate the reversal of the conviction of a co-defendant who has been convicted as an aider and abettor. *See Morriss v. United States*, 554 A.2d 784, 790 (D.C. 1989) ("... the acquittal of a principal does not preclude conviction of an aider and abettor") (citing *Standefer v. United States*, 447 U.S. 10, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980)). However, to convict for aiding and abetting, "it is necessary that the government show that 'the act constituting the offense was in fact committed by someone.'" *Id.* (quoting *Gray v. United States*, 104 U.S.App.D.C. 153, 154, 260 F.2d 483, 484 (1958)).

▮ At trial, there was neither evidence, nor any claim by the government, that Willis was guilty of AWIMWA as a principal. Willis's AWIMWA convictions were based not on proof of any actions that he took independently of Howard but, rather, on the theory that Willis assisted in, and thus facilitated, Howard's attacks on Boone and Womack. Thus, Willis's two convictions for aiding and abetting assaults with intent to commit murder while armed were premised on the assumption that Howard, in fact, committed those crimes. *See Jackson v. United States*, 395 A.2d 99, 103 n. 6 (D.C.1978) ("[o]ne cannot aid and abet in the commission of a crime unless there is another who has committed the offense"). Having now held that Howard's AWIMWA convictions must be reversed because the trial court erroneously excluded evidence of mitigating circumstances,[14] we also must reverse Willis' AWIMWA convictions as well. *See Morriss*, 554 A.2d at 790 (finding it "just in the circumstances" to reverse conviction for aiding and abetting murder where principals' convictions were reversed on grounds of trial error).

---

**13.** Our dissenting colleague says that "[a]ppellant's counsel had a factual basis for, and did argue in closing, that appellant feared Womack and Boone because they had been trying to kill him." *Post* at 1123. True—but beside the point because the trial court excluded evidence of that fear that, very likely, was much more credible than Howard's own cryptic testimony, which was the only evidence that served as the basis for counsel's argument.

**14.** As noted above in Part III.B., the presence of mitigating circumstances may preclude a finding of malice, a required element of assault with intent to murder.

If we did not reverse Willis's convictions, we would be affirming convictions for aiding and abetting in malicious assaults while holding, at the same time, that proof of malice was insufficient. This we cannot properly do.

### E.

■ We turn now to the proper dispositions. Here, the trial court's error impacts only the charges of assault with intent to murder while armed. Under these circumstances, we reverse and remand as to the charges of assault with intent to murder while armed. In all other respects appellant's convictions are affirmed, subject to resentencing as to each appellant's merged convictions for possession of a firearm during a crime of violence. See *supra* note 1.

*So ordered.*

WAGNER, Chief Judge, concurring in part and dissenting in part:

The majority holds that the trial court's exclusion of additional evidence of appellant's testimony of the victim's prior violent acts against him was error of constitutional dimension requiring reversal of his conviction for assault with intent to murder while armed. With this part of the court's opinion, I must respectfully disagree.[1] Even assuming constitutional error, in my view, it was harmless beyond a reasonable doubt. *See Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); *see Bassil v. United States,* 517 A.2d 714, 717 (D.C.1986). Since the substance of the evidence was placed before the jury, reversal is not warranted merely because appellant's presentation was not as exhaustive on the issue as he might have desired.

### I.

Appellant Howard sought to present evidence, including his own further testimony, that (1) about three weeks prior to the date of the charged offenses, Kevin Womack, who was accompanied by Lonnie Boone, shot at

him while they were in the same general vicinity; and (2) several months earlier, Womack, who apparently then believed that Howard was responsible for shooting and wounding Womack's brother, displayed a gun in a menacing manner in Howard's presence. Counsel for Howard proffered that Fidel Braxton could provide testimony that:

> about three or four weeks before the events in this case, sometime in mid-January ... he saw Mr. Howard in the area of G Street, Southeast. Mr. Braxton was in a car with some other people, then, in fact, going to pick up Mr. Howard.
>
> They saw Mr. Howard running down the street. He jumped in the car and blurted out he had been shot at by Kevin [Womack] and Lonnie [Boone].

Although counsel for appellant indicated that other witnesses would corroborate the testimony, no further elaboration of their anticipated testimony was proffered.

At the outset, it must be considered that the prior shooting incident was placed prominently before the jury through the testimony of three witnesses. First, the complaining witness, Lonnie Boone, testified that appellant confronted him about the alleged prior shooting, stating, "I heard you and Kevin [Womack] supposed to be—try and kill [me]." According to another witness for the government, Derrick Ross, Howard asked Boone "why they tried to creep on him and why did he tell everybody he was going to bust him," and why "you and Kevin tried to sneak up on me that day coming from a party." In addition to the evidence adduced during the government's case, appellant Howard, through his own testimony, placed before the jury evidence of the prior incidents. He testified that while at the Farmer's Market on the day of the offenses, he confronted Boone and told him, "I saw y'all. I saw y'all when y'all was—y'all had shot at me one day." Howard further testified that he asked Boone "why did they try to kill me." According to appellant's testimony, Boone responded that it was Womack who had shot at him. Appellant then accused

---

1. Except insofar as inconsistent with this dissenting opinion, I join in the other portions of the opinion of the court.

Boone of being with Womack at the time, and Boone denied it. Howard testified that he acquired the weapons after the incident which occurred three weeks earlier and that he had taken the weapons with him on the night of the shooting because he knew that "these guys and Derrick [Ross] had a gun." He made further reference to the prior incident in describing the encounter with Womack and Boone on the night of the shooting. He testified again that he asked them why "they tried to do something to hurt me." Braxton's excluded testimony would have corroborated the prior shooting incident only to the extent that it would have established that on a prior occasion appellant believed that Womack and Boone had fired a shot at him, a fact not in dispute.

While the trial court also excluded evidence about an alleged prior occasion when Womack displayed a gun in Howard's presence in a menacing manner, the impact of the omission of this evidence must be evaluated in light of the evidence actually presented. The defense had the benefit of the testimony of the government's witness, Ross, that before Howard shot Womack, Womack had been making gestures that would have caused a policeman to shoot him. This testimony by a prosecution witness corroborated the accused's statement that the shooting involved in this case was provoked by Womack's threatening actions at the critical time. Thus, the vague statement that on a prior occasion Womack had displayed a gun in a menacing manner would have been cumulative at best on the issue of provocation.

## II.

I agree with the majority, and the government concedes, that this evidence has some relevance to the third element of the offense of assault with intent to murder while armed (AWIMWA), *i.e.*, whether there were mitigating circumstances in that appellant acted in self-defense.[2] *See United States v. Hobbs,* 594 A.2d 66, 69 (D.C.1991); *see also* CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.10 (4th Ed.1993). Of course, not every act of provocation by a victim is a legally cognizable mitigating factor. *See Comber v. United States,* 584 A.2d 26, 41 (D.C.1990). Where sufficient time elapses between the victim's act of violence and the criminal offense, legal provocation will not be established. *See Jamison v. United States,* 373 A.2d 594, 596 (D.C.1977[3]. The excluded evidence in this case was of the same nature and would not be legally sufficient, in itself, to support a claim that appellant acted in the heat of passion.[4] Nevertheless, the evidence was relevant to appellant's state of mind at the time that he claims he acted in self-defense, or at least under the mistaken belief that he was in imminent danger of serious bodily harm, according to his testimony. *See Comber,* 584 A.2d at 41 (mitigation may be found where a killing is committed under the mistaken belief that a defendant is in mortal danger). It is in this

2. Although self-defense was excluded as a matter of law from consideration by the jury, the issue remained viable as bearing on the element of mitigation for the offense of AWIMWA.

3. In *Jamison,* this court sustained the trial court's finding that the evidentiary predicate was inadequate for an instruction on manslaughter as a lesser included offense of second-degree murder where the defendant contended that he was provoked to shoot the decedent because he kept robbing him and his father. *Id.* The court explained:

[a]pparently, appellant had been robbed by [the decedent] earlier in the evening on the night of the shooting. However, the facts indicate that appellant had had plenty of time and opportunity to calm down, and that he was calm at the time he entered the bar and deliberately shot [the victim].

*Id.* n. 6.

4. Mitigating circumstances are defined in pertinent part in the standard jury instructions used in the trial court as follows:

Mitigating circumstances exist where a person acts in the heat of passion caused by adequate provocation. Heat of passion includes rage, resentment, anger, terror and fear. A person acts upon adequate provocation if his/her action is provoked by conduct that would cause an ordinary, reasonable person in the heat of the moment to lose his/her self-control and act on impulse and without reflection. An act of violence or an immediate threat of violence may be adequate provocation, but a slight provocation, entirely out of proportion to the retaliation, is not adequate provocation.

No. 4.10; *see also Comber, supra,* 584 A.2d at 41.

context that the claimed error must be reviewed.

Extrinsic evidence that a complaining witness has committed prior violent acts against the accused is admissible to show the reasonableness of the accused's fear of danger at the time he claims he acted in self-defense. *Harris v. United States*, 618 A.2d 140, 144 (D.C.1992). However, the trial court "may still exercise its discretion to limit the 'substance, form, and quantum of evidence' presented on the issue." *Id.* at 145 (quoting *Johnson v. United States*, 452 A.2d 959, 960 (D.C.1982)).

> The court may exclude such evidence, even when relevant, if its probative value is outweighed by the danger of its unduly prejudicial effect, *Hawkins [v. United States]*, 461 A.2d [1025] at 1033 [ (D.C. 1983) ] or if the proffered evidence is cumulative, vague and uncertain. *Hurt v. United States*, 337 A.2d 215, 217 (D.C. 1975).

*Harris*, 618 A.2d at 145. We review such rulings for an abuse of discretion. *Id.* at 144.

The trial court's discretion in reviewing evidentiary rulings must be evaluated against an accused's right to present a defense. *Clark v. United States*, 639 A.2d 76, 81 (D.C. 1993). Where "the trial court's evidentiary ruling wholly deprived the defendant of any opportunity to ... present evidence concerning ... a central issue in the case, we may only affirm if we are convinced that the error was harmless beyond a reasonable doubt." *Chapman, supra*, 386 U.S. at 24, 87 S.Ct. at 828; *Clark*, 639 A.2d at 81. "Not every evidentiary decision of the trial court, however, necessarily implicates the defendant's constitutional right to ... present a defense.... If the issue is merely collateral, or where ample cross-examination has already been allowed or evidence admitted on a particular issue, trial court curtailment of the defendant's presentation does not implicate the defendant's Sixth Amendment rights, and we apply the less stringent test for harmless error set forth in *Kotteakos v.*

*United States*, 328 U.S. 750, 765 [66 S.Ct. 1239, 1248, 90 L.Ed. 1557] (1946)." *Id.* at 82.[5] The majority concludes that evidence of the victim's prior violent acts were central to an element of the crime charged, and therefore, the more stringent standard of *Chapman* applies. We need not decide whether evidence of the victim's prior violent acts, which bear only upon the accused's state of mind at the time of the events involved, must be viewed as a central issue in the case because, even under the *Chapman* harmless error standard, the error was harmless in this case.

In the analysis under *Chapman*, we consider a number of factors, including the importance of the excluded evidence to the defendant's case, whether it was cumulative, the presence or absence of other evidence bearing on the point, and the overall strength of the government's case. *See Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986). In this case, appellant Howard was able to present to the jury the substance of the excluded evidence through his own testimony. He testified that the victims had tried to kill him previously and that he had reason to believe that they were armed on the night of the crimes, and thus had reason to fear for his safety. Braxton, who could corroborate only appellant's reaction to the prior violent acts of the victims and not the actual occurrence of the events, would provide only cumulative evidence according to the proffer. Appellant's remaining proffer about potential witnesses was vague. Moreover, the central issue was what occurred on the night of the crimes. Appellant had a full opportunity to present evidence about those events, including the alleged actions of the victims which caused him to believe mistakenly that he was acting in self-defense. Appellant's counsel had a factual basis for arguing, and did argue in closing, that appellant feared Womack and Boone because they had been trying to kill him.

---

5. Under that standard, the error is considered harmless only if we can say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that

the judgment was not substantially swayed by the error." *Kotteakos*, 328 U.S. at 765, 66 S.Ct. at 1248.

Further, the government's case against appellant Howard was strong. Three witnesses supported the government's version of the shooting, Boone, Womack, and Ross. There was physical evidence that appellant shot Womack three times in the back. Shell casings were found near Womack's body, a fact consistent with the testimony of government witnesses, but inconsistent with appellant Howard's testimony that he was some significant distance away from Womack at the time of the shooting. Finally, appellant's version of events, which was apparently rejected by the jury, was somewhat implausible to say the least. Essentially, that version was that after being in a fistfight with an individual whom he believed was trying to kill him, he first obtained an automatic pistol and a sawed-off shotgun, sought him out only to make peace, and shot at Womack four times with the two weapons, hitting him in the back three times, but in self-defense. On these facts, even assuming that the damaging potential of the proffered evidence were realized, in my view, we can say that any error in exclusion of the evidence was harmless beyond a reasonable doubt.